In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2357

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REX HAMMOND,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 18-cr-00005 — **Robert L. Miller, Jr.**, *Judge.*

ARGUED OCTOBER 27, 2020 — DECIDED APRIL 26, 2021

Before SYKES, *Chief Judge*, and KANNE and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Over the course of a three-week crime spree in October 2017, Rex Hammond robbed, or attempted to rob, seven stores at gunpoint in Indiana and Michigan. Five of the seven incidents took place in northern Indiana, where the government charged Hammond with five counts of Hobbs Act robbery and several attendant weapons charges. The charges included one count of being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g) and
two counts of brandishing a weapon during a crime of vio-
lence in violation of 18 U.S.C. § 924(c). A jury convicted Ham-
mond of all charges, and the district court sentenced him to
forty-seven years in prison.

Hammond now appeals his conviction and sentence. First,
he argues that the district court should have suppressed cer-
tain cell site location information that law enforcement col-
lected to locate him during his robbery spree and to confirm
his location on the days of the robberies, based on *Carpenter v.
United States*, 138 S. Ct. 2206 (2018). He also argues that the
district court erred in instructing the jury regarding the felon-
in-possession charge under *Rehaif v. United States*, 139 S. Ct.
2191 (2019). Finally, he claims that Hobbs Act robbery is not a
crime of violence under 18 U.S.C. § 924(c) or under the Sen-
tencing Guidelines, so his § 924(c) conviction must be over-
turned, and his sentence vacated. We reject each of these ar-
guments and affirm Hammond's conviction and sentence in
all respects.

## I. Background

In October 2017, a series of armed robberies plagued
northern Indiana and southern Michigan. Each robbery in-
volved a white man wearing a long sleeved, gray t-shirt; a
winter hat; a black face mask; clear, plastic gloves; and bright
blue tennis shoes. During each incident, the perpetrator
walked straight up to the register and demanded that the
cashier withdraw cash from the register and put it into a bag
that the man provided. Based on the similarities among the
robberies, law enforcement suspected that the same perpetra-
tor had committed them. Robberies took place on Friday, Oc-
tober 6 in Logansport, Indiana; Saturday, October 7 in Peru,

Indiana; and Monday, October 9 in Auburn, Indiana. On October 10, the perpetrator attempted two unsuccessful robberies in southern Michigan—one in Portage and one in Kalamazoo.

During the first attempted robbery on October 10, the cashier fled the scene, leaving the suspect to attempt opening the cash register himself. He failed and fled. The perpetrator then attempted a second robbery, this time at a liquor store in the adjoining town of Kalamazoo. This endeavor also ended poorly for the robber. Rather than placing the cash into the robber's bag as directed, the store clerk placed the cash from the register on the counter. This forced the robber to attempt to stuff the cash into the bag and gave the store clerk an opportunity to grab the gun, a desert-sand colored Hi-Point, and swipe it behind the counter. The robber fled without the weapon.

Leaving his weapon behind had two important consequences: First, there was a two-week hiatus between the Kalamazoo attempted robbery and the resumption of the robberies on October 24. In that time, the robber secured a new weapon—a dark colored, .22 caliber revolver. Witnesses prior to the Kalamazoo robbery described the robber's weapon as a "light brown gun." After October 10, witnesses described the robber's weapon as a "dark revolver." The robber committed two additional robberies using the dark revolver, on October 25 in Decatur, Indiana and October 27 in Logansport, Indiana. Despite the change in weapon, other similarities with the earlier robberies indicated that the same suspect likely committed the late October robberies.

Second, in addition to forcing the robber to find a new weapon, the Kalamazoo store clerk's quick thinking also gave

law enforcement their first substantial clue as to the identity of the robber. By this time, federal and state law enforcement agencies had begun cooperating with each other to investigate the string of incidents. So, on Wednesday, October 25, officers from several jurisdictions met to review surveillance of the robberies, including Agent Andrew Badowski of the Bureau of Alcohol, Tobacco and Firearms ("ATF"); Detective Jacob Quick of the Indiana State Police; Detective Tyler Preston of the Logansport, Indiana police; Detective Stacey Sexton of the Auburn, Indiana police; and Detective Cory Ghiringhelli of the Kalamazoo, Michigan police.

Upon recovery of the desert-sand colored Hi-Point, ATF Agent Badowski traced the weapon to Todd Forsythe, who reported that he had sold the weapon to "Rex." Forsythe also provided Badowski with the cell phone number that "Rex" used to arrange the gun sale. On Saturday, October 28, Badowski conveyed this information to Detective Quick, who traced the phone number to the defendant, Rex Hammond. Using Indiana DMV records, the officers also confirmed that Hammond's vehicle, a light-colored Chrysler Concorde, matched descriptions of the vehicle used during the robberies and caught on surveillance footage near the scenes of the crimes. Officers also learned that Hammond had several prior convictions in Indiana, including armed robbery.

The parties dispute exactly when officers learned all of this information: Hammond asserts that officers knew that he was the prime suspect by Saturday, October 28 and that officers could have sought a warrant at the time. In contrast, the government emphasizes that while officers suspected Hammond had committed the robberies, they spent the weekend confirming that the evidence linked Hammond to the robberies,

including re-interviewing Forsythe on Sunday, October 29. Detective Ghiringhelli testified that "the information identifying our suspect came over the weekend. I believe it came the evening of the 28th, which was a Saturday. It either came the 28th or 29th. It was that weekend." Ghiringhelli also testified that he believed that he had probable cause to arrest Hammond by Monday, October 30.

On that Monday, Ghiringhelli submitted an "exigency" request under 18 U.S.C. § 2702(c)(4) to AT&T, requesting cell site location information ("CSLI") to geolocate Hammond using the cell phone number that Forsythe had provided. In addition to real-time "pings" to nearby cell towers, Ghiringhelli requested Hammond's historical CSLI dating back to the beginning of the robbery spree on October 7. AT&T complied with Ghiringhelli's request. The historical CSLI records confirmed that Hammond's phone was near Portage and Kalamazoo, Michigan on October 10, and AT&T began providing real-time CSLI, consisting of "pings" to Hammond's location roughly every fifteen minutes, commencing at approximately 6 p.m. on October 30.

Using this real-time CSLI, Ghiringhelli directed Detectives Quick and Sexton to Elkhart, Indiana around 7:30 or 8 p.m. on Monday, October 30. The officers could not locate Hammond in Elkhart. Around 11:30 p.m., Hammond's CSLI pinged near the Indiana toll road in South Bend. Following that ping, Quick and Sexton recognized Hammond's light blue Chrysler Concorde in a Quality Inn parking lot in South Bend. Quick ran the license plate and confirmed it belonged to Hammond. The detectives called for backup and began following Hammond when he exited the parking lot after midnight. As Hammond drove south from South Bend toward Marshall County,

Detective Quick called the county's sheriff's department, informed the department that he was following an armed robbery suspect, and requested a traffic stop. After apparently realizing that officers were following him, Hammond lost the officers by engaging in evasive driving maneuvers. While waiting on updated CSLI information from Ghiringhelli, Quick and Sexton met with Marshall County Deputy Kerry Brouyette. During this meeting, Brouyette recognized Hammond drive past them, so the officers resumed their pursuit. Brouyette ultimately stopped Hammond's car around 1:23 a.m. for speeding and failing to signal. At the time, Hammond wore a gray t-shirt, a winter hat, and bright blue tennis shoes, matching the description provided by the robbery victims.

After Detective Quick confirmed with Logansport[1] Detective Preston that they should arrest Hammond immediately, the officers ordered Hammond and his passenger, Alexandra Latendresse, out of the vehicle. They arrested Hammond and read him his *Miranda* rights. Hammond told officers that everything in the car belonged to him, and Latendresse told officers that Hammond had told her that they were going to "get[] some money." Detective Quick later sought and obtained a search warrant for Hammond's car, which contained a black .22 caliber revolver, 44 rounds of .22 caliber ammunition, methamphetamine, a white plastic bag, rubber gloves, a cell phone, and a Garmin GPS Unit.

A grand jury indicted Hammond on January 10, 2018 for five counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951; two counts of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); and one count of

---

[1] The location of the first and last of the Indiana robberies.

being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

Also in January 2018, the government filed an *ex parte* application for a court order for Hammond's historical CSLI. Although the application acknowledged that law enforcement had already obtained "partial phone records" from Hammond's phone, the application did not rely on those records as a basis for granting the application. The magistrate judge found "reasonable grounds to believe that the records … are relevant and material to an ongoing criminal investigation" and ordered AT&T to disclose the historical CSLI records pursuant to 18 U.S.C. § 2703(d). The records confirmed that around the time of each robbery, Hammond's phone connected to AT&T towers near the stores.

Approximately six months after the magistrate judge issued the § 2703(d) order, the Supreme Court held that the collection of historical CSLI over the course of 127 days, without a warrant, was a search in violation of the Fourth Amendment. *Carpenter*, 138 S. Ct. at 2217. As such, *Carpenter* held that the government must "generally" obtain a warrant before obtaining such records. *Id.* at 2222.

Relying substantially on *Carpenter*, Hammond moved the district court in September 2018 to suppress all cell phone data related to Hammond's phone number, the physical evidence recovered from Hammond's car, and the statements made by Hammond and Latendresse during the October 31 traffic stop. After a lengthy suppression hearing, the district court ruled that although the collection of Hammond's CSLI was a search, Detective Ghiringhelli had relied in good faith on the Stored Communications Act in requesting the information from AT&T. In the district court's view, because the

Supreme Court had not yet decided *Carpenter* at the time of the search, it was reasonable for Detective Ghiringhelli to rely on the Stored Communications Act's provisions in requesting cell phone data from AT&T.

The government tried Hammond before a jury in April 2019. The government called roughly thirty witnesses over the course of three days; the defense did not call any witnesses and immediately rested. The jury returned a verdict of guilty on all counts after roughly one hour of deliberations.

After trial, Hammond moved to vacate his felon-in-possession conviction, based on the Supreme Court's intervening ruling in *Rehaif v. United States,* which held that a felon-in-possession conviction requires knowledge of felon status. 139 S. Ct. at 2191, 2200. The district court denied the motion.

The district court sentenced Hammond to forty-seven years (564 months) in prison: ten, twelve, fourteen, sixteen, and eighteen years to run concurrently for each of the five Hobbs Act robbery convictions, plus consecutive, mandatory minimum sentences of seven, seven, and fifteen years for the two brandishing-a-weapon counts and felon-in-possession count, respectively. This appeal followed.

## II. Discussion

### A. Suppression of Cell Site Location Information and Resulting Evidence

Hammond first challenges the district court's denial of his motion to suppress the CSLI obtained from AT&T and the evidence derived from that data, including the physical evidence recovered from his car and his and Latendresse's statements to officers during the traffic stop. Hammond focuses on the Supreme Court's decision in *Carpenter*, which found that

the collection of historical CSLI without a warrant constituted a search in violation of the Fourth Amendment. 138 S. Ct. at 2220. Hammond argues that *Carpenter* compels the exclusion of the CSLI collected in this case. In response, the government asserts a litany of reasons why suppression is unwarranted.

The government collected three different types of CSLI[2] from Hammond's phone: (1) the historical CSLI collected by the government under the authority of the magistrate judge's § 2703(d) order, (2) the historical CSLI collected by Ghiringhelli to confirm Hammond's proximity to the Michigan robberies, and (3) the "real time" CSLI collected by Ghiringhelli for several hours to physically locate Hammond in Indiana. Each of these categories requires a separate Fourth Amendment analysis. As we explain below, we hold that the first category—the historical CSLI collected under the magistrate judge's § 2703(d) order—was a search for Fourth Amendment purposes, but was collected in good faith reliance on § 2703(d) of the Stored Communication Act, which was settled law at the time the government collected the data. As a result, the Fourth Amendment does not require the district court to exclude this evidence from the jury's consideration. The second category of CSLI—the historical CSLI collected by Ghiringhelli—was not introduced at trial nor did it "taint" any other evidence. Accordingly, there is no need to

---

[2] "CSLI is location information generated by cellular phone providers that indicates which cell tower a particular phone was communicating with when a communication was made." *United States v. Curtis*, 901 F.3d 846, 847 (7th Cir. 2018) (citation omitted). "Any cell phone with a functioning battery regularly communicates with cell towers. The phone leaves behind a trail" of this data. *United States v. Castro-Aguirre*, 983 F.3d 927, 934 (7th Cir. 2020).

exclude evidence never admitted at trial or used improperly to obtain additional evidence. Finally, the collection of the CSLI in the third category—Hammond's real-time CSLI— was not a search for Fourth Amendment purposes based on the facts of this case. We discuss each of these categories of CSLI below.

### 1. Standard of Review

We review a district court's denial of a motion to suppress "under a 'dual standard of review'; we review legal conclusions de novo but findings of fact for clear error." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (quoting *United States v. Tepiew*, 859 F.3d 452, 456 (7th Cir. 2017)). "A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a definite and firm conviction that a mistake has been made." *United States v. Thurman*, 889 F.3d 356, 363 (7th Cir. 2018) (quoting *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009)).

### 2. Analysis

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. Amend. IV. "The 'touchstone' of the Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Henry v. Hulett*, 969 F.3d 769, 776–77 (7th Cir. 2020) (citing *Oliver v. United States*, 466 U.S. 170, 177 (1984)); *see also Riley v. California*, 573 U.S. 373, 381 (2014). As explained in Justice Harlan's concurring opinion in *Katz v. United States*, the Fourth Amendment requires both that the defendant held a subjective expectation of privacy and that "society is prepared

to recognize [that expectation] as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *see also Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (recognizing the primacy and wide acceptance of Justice Harlan's concurrence); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (same). "To determine whether someone has a legitimate expectation of privacy, courts must consider (1) whether that person, by his conduct, has exhibited an actual, subjective expectation of privacy and (2) whether his expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Sawyer*, 929 F.3d 497, 499 (7th Cir. 2019).

If a defendant has the requisite expectation of privacy, the Fourth Amendment generally requires law enforcement to obtain a warrant before executing a search. *See Riley*, 573 U.S. at 382. "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 459–60 (2011)). "One well-recognized exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *King*, 563 U.S. at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

The Supreme Court "fashioned the exclusionary rule" to "compel respect for the constitutional guaranty" of freedom from unreasonable searches. *United States v. Martin*, 807 F.3d 842, 846 (7th Cir. 2015) (quoting *Davis v. United States*, 564 U.S. 229 (2011)). "The [exclusionary] rule is not a 'personal constitutional right,' and its application 'exacts a heavy toll on both the judicial system and society at large,' as its effect often 'is to suppress the truth and set the criminal loose in the

community without punishment.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974); *Davis*, 564 U.S. at 237). "The exclusionary rule is designed primarily to deter unconstitutional conduct." *United States v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018). The exclusionary rule therefore does not apply when law enforcement has relied in good faith on a facially valid warrant, *United States v. Leon*, 468 U.S. 897, 922 (1984); a then-valid statute, *Illinois v. Krull*, 480 U.S. 340, 357 (1987); or binding circuit precedent, *Davis*, 564 U.S. at 232. Succinctly, "[s]uppression of evidence…has always been our last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

### i. Historical CSLI Obtained Pursuant to § 2703(d) Order

We first address the government's collection of Hammond's historical CSLI from AT&T pursuant to the § 2703(d) order.

Section 2703 of the Stored Communications Act, entitled "Required disclosure of customer communications or records," authorizes courts to "order cell-phone providers to disclose non-content information if the government 'offers specific and articulable facts showing that there are reasonable grounds to believe that ... the records or other information sought are relevant and material to an ongoing criminal investigation.'" *Curtis*, 901 F.3d at 848 (quoting 18 U.S.C. §§ 2703(c)(1)(B), (d)).

Based on this statutory authority, in January 2018, the government sought a § 2703(d) order from the magistrate judge directing AT&T to release Hammond's historical CSLI to the government. In its application for the order, the government recounted the distinctive details of the five Indiana robberies, Agent Badowski's investigation into the abandoned Hi-Point,

the gun-seller's identification of "Rex" and his cell phone number, Hammond's ownership of the phone number, and the similarities in appearance between Hammond's driver's license photo and the images of the suspect from the security footage of the robberies. Based on this evidence, the government represented that "there [were] reasonable grounds to believe that the records … are relevant and material to an ongoing criminal investigation." The magistrate judge agreed and issued the order.

Six months after the magistrate judge issued its order in January 2018, the Supreme Court decided *Carpenter*, which held that the government "must generally obtain a warrant supported by probable cause before acquiring [historical CSLI]." 138 S. Ct. at 2221. Authorization by § 2703(d) is constitutionally insufficient. *Id.* Hammond now seeks to exclude the historical CSLI based on *Carpenter*'s holding.

We addressed this argument in *Curtis*. 901 F.3d at 848. There, the government relied on § 2703(d) to collect the defendant's CSLI for 314 days, before the Supreme Court issued its decision in *Carpenter*. We concluded that the district court properly admitted the CSLI obtained pre-*Carpenter* based on the good faith exception to the warrant requirement. *Id.* (citing *Krull*, 480 U.S. at 349–50) (holding that the good faith exception announced in *Leon*, 468 U.S. 897, is "equally applicable" to cases in which law enforcement reasonably relied on a statute authorizing warrantless searches that is later found to violate the Fourth Amendment); *see also United States v. Castro-Aguirre*, 983 F.3d 927, 935 (7th Cir. 2020).

While *Carpenter* now makes clear that law enforcement's reliance on a § 2703(d) order is insufficient to satisfy the Fourth Amendment's warrant requirement for the collection

of historical CSLI,[3] our decision in *Curtis* is equally clear that the exclusionary rule does not apply where the government relied in good faith on § 2703(d) prior to *Carpenter*. *Id.* at 848. As a result, "even though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information [is] not required because it was collected in good faith" reliance on § 2703(d). *Id.* at 849. As we said in *Castro-Aguirre*, "[w]e are not inclined to revisit *Curtis*," and Hammond provides no argument to do so. 983 F.3d at 935. Thus, the district court properly admitted the historical CSLI obtained pursuant to the § 2703 order, "because the government, following the procedures set forth in the Act, gathered it in good faith." *Id.*

Hammond contends that the historical CSLI that Ghiringhelli collected, which we discuss below, tainted the CSLI obtained pursuant to the § 2703(d) order. Hammond is mistaken. Though the government's § 2703(d) application referenced the partial records that the government already possessed due to the detective's investigation, it did not rely on those records. The application merely disclosed that "[p]artial phone records for the target phone were obtained by Kalamazoo, Michigan Department of Public Safety investigators." The application did not rely on facts discovered due to those records—for example, the application does not represent that those records confirmed Hammond's proximity to any one of the robberies. Indeed, the above quoted sentence could be

---

[3] Although the Supreme Court decided *Carpenter* after the government applied for and received the § 2703(d) order and received Hammond's records, *Carpenter* controls our analysis. *See United States v. Maez*, 960 F.3d 949, 954 (7th Cir. 2020) ("Current law governs our review on direct appeal.").

excised from the application without altering the quantum of evidence before the magistrate judge showing that the historical CSLI was materially related to an ongoing criminal investigation. Accordingly, the historical CSLI obtained by Ghiringhelli did not taint the historical CSLI obtained via the § 2703(d) order. *See Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (evidence from an "independent source" need not be excluded).

### ii. Historical CSLI Requested by Detective Ghiringhelli

We now turn to the historical CSLI collected by Detective Ghiringhelli. While the prosecutor obtained Hammond's historical CSLI under § 2703(d) of the Stored Communications Act, Detective Ghiringhelli relied on § 2702 of the Act, entitled "Voluntary disclosure of customer communications or records." Unlike § 2703, § 2702 does not compel telecommunications carriers to provide records to law enforcement. Instead, § 2702 permits carriers to release records to a governmental entity, "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." 18 U.S.C. § 2702(c)(4).

Regardless of the differences between §§ 2702 and 2703, any alleged Fourth Amendment violation by Ghiringhelli's request for Hammond's historical CSLI is a violation in want of a remedy. Critically, the historical CSLI requested by Ghiringhelli was never introduced at trial, nor did it bear "fruit." *See Wong Sun*, 371 U.S. at 487. Investigators did not use this subset of historical CSLI to locate Hammond himself or to locate any other evidence used against him. Thus, even if Detective Ghiringhelli violated Hammond's Fourth Amendment

rights, the district court could not exclude evidence that was never used or admitted in the first place.

We reiterate that the only historical CSLI introduced at trial was the historical CSLI that the government obtained under the magistrate judge's order, *not* the detective's § 2702 request to AT&T. As explained above, the latter did not taint the former, because the § 2703(d) application did not rely on the records obtained by Detective Ghiringhelli under § 2702 in any substantive way.

In any event, the historical CSLI that the government ultimately introduced at trial was also admissible under the independent source doctrine. "[T]he central question under the independent source doctrine is whether the evidence at issue was obtained by independent legal means." *United States v. Bell*, 925 F.3d 362, 370 (7th Cir. 2019) (quoting *United States v. May*, 214 F.3d 900, 906 (7th Cir. 2000)). Here, the government ultimately obtained Hammond's historical CSLI based on a good faith reliance on § 2703(d), independent from Detective Ghiringhelli's § 2702 request.

### iii. Real-Time CSLI

Finally, we address the CSLI collected by Detective Ghiringhelli in real time, which officers used to physically locate Hammond in Indiana. For the reasons explained below, we agree with the government that the collection of Hammond's real-time CSLI did not constitute a search under the particular circumstances of this case.[4]

---

[4] The district court believed that the government had conceded the threshold question that the collection of Hammond's real-time CSLI constituted a search and that *Carpenter* would apply. The district court then

The "narrow" *Carpenter* decision did not determine whether the collection of real-time CSLI constitutes a Fourth Amendment search. 138 S. Ct. at 2220. There, the Court explicitly did "not express a view on matters not before [the Court]," including "real-time CSLI." *Id.; see also United States v. Green*, 981 F.3d 945, 958 (11th Cir. 2020) ("The question of whether acquiring [real-time tracking data] constitutes a search was unanswered in 2013 and remains unanswered today.") (citing *Carpenter*, 138 S. Ct. at 2217–19, 2221); *United States v. Thompson*, No. 13-40060-10-DDC, 2019 WL 3412304, at *7 (D. Kan. July 29, 2019) ("And, extending *Carpenter's* holding about the seizure of historical CSLI to the seizure of real-time CSLI is far from clear because *Carpenter* emphasized that historical CSLI allowed the government to learn of a person's whereabouts on a nearly 24-hour, seven-day-a-week basis. Meanwhile, seizing CSLI in real-time only reveals a person's whereabouts at the moment of its seizure.").[5]

------

denied Hammond's motion to suppress by relying on the good faith exception to the Fourth Amendment's warrant requirement. *See Curtis*, 901 F.3d at 847–48. On appeal, the government clarifies that it did not concede that the Fourth Amendment applies to Hammond's real-time CSLI. To the contrary, in its response to Hammond's motion to suppress, the government "accept[ed] for the sake of argument (without conceding) that real-time data is subject to the same Fourth Amendment protections as historical data."

[5] We also have yet to answer this question post-*Carpenter*, or the related question of whether the use of a cell-site simulator to locate a suspect is a search under the Fourth Amendment. *See United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016) ("Questions about whether use of a simulator is a search, … have yet to be addressed by any United States court of appeals. We think it best to withhold full analysis until these issues control the outcome of a concrete case.").

To answer this open question, we turn to the Supreme Court's jurisprudence pre-*Carpenter*. Before the ubiquity of cell phones, the Court held in *United States v. Knotts* that law enforcement agents did not conduct a "search" when they attached a beeper to a drum of chloroform to track the chloroform's (and the defendants') movements. 460 U.S. 276 (1983). There, the beeper only tracked the chloroform from its place of purchase in Minnesota (where the manufacturer consented to the installation of the beeper) to a secluded cabin in Wisconsin where the defendants used it to manufacture illicit drugs. *Id.* at 277–78. The Court reasoned that the defendant-driver had no reasonable expectation in his privacy while travelling on public roads:

> A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [the suspect] travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.

*Id.* at 281–82.

The Court took up the constitutionality of more modern modes of tracking in *United States v. Jones*. There, the Court decided that law enforcement's attachment of a GPS unit to a suspect's car for twenty-eight days was a Fourth Amendment search. *United States v. Jones*, 565 U.S. 400, 404 (2012). The majority grounded its analysis in common law trespass doctrine and emphasized that the "[g]overnment physically occupied

private property for the purpose of obtaining information." *Id.*

*Carpenter* then answered a question that *Jones* left open—whether a physical intrusion onto the defendant's property was *necessary*, and not just *sufficient*, to constitute a search. In *Carpenter*, prosecutors sought a § 2703(d) order for the historical CSLI from the cell phones of several suspects in a series of robberies in Michigan and Ohio in 2011. *Carpenter*, 138 S. Ct. at 2212. The § 2703(d) application requested records spanning 127 days, as well as records for some shorter periods of time. *Id.* Carpenter moved to suppress this evidence, but the district court and the Court of Appeals for the Sixth Circuit refused because "Carpenter lacked a reasonable expectation of privacy in the location information collected by the FBI because he had shared that information with his wireless carriers." *Id.* at 2213.

Diverging from the Sixth Circuit's analysis, the *Carpenter* majority held that the third-party disclosure doctrine did not apply to law enforcement's collection of historical CSLI from cell phone carriers.[6] 138 S. Ct. at 2217. The Court refused to extend the third-party disclosure doctrine to the "novel circumstances" presented by the case—namely, the government's harvesting of a "detailed chronicle of a person's

---

[6] The third-party disclosure doctrine ordinarily excludes from the Fourth Amendment's protections any information that that the defendant has already shared with a third party, because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 2216 (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979)).

physical presence compiled every day [and] every moment, over [potentially] several years." *Id.* at 2217, 2220.

Rejecting the third-party doctrine in the context of cell phones, the Court reasoned that society simply does not expect that the police would be able to follow an individual's every movement for weeks at a time:

> Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so "for any extended period of time was difficult and costly and therefore rarely undertaken." For that reason, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period."
>
> Allowing government access to cell-site records contravenes that expectation. … As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations."

*Carpenter*, 138 S. Ct. at 2217. Accordingly, "[w]hether the Government employs its own surveillance technology as in *Jones* or leverages the technology of a wireless carrier, … an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* Therefore, "an order issued under Section 2703(d) of the [Stored Communications] Act is not a permissible mechanism for accessing historical cell-site records." *Id.* at 2221. Instead, the government must obtain a warrant for historical CSLI.

Given that *Carpenter* disclaimed providing any answer to the question before us, we consider whether the facts of this case are more similar to *Carpenter* or to *Knotts*, and importantly, how the principles and expectations that animated those decisions play out in this case. Here, we are persuaded that the unique facts of this case have more in common with *Knotts* than *Carpenter*. And, although *Carpenter* rejected *Knotts'* reasoning as applied to *historical* CSLI, we agree with the Sixth Circuit that given the opinion's limited holding, *Carpenter* otherwise "left undisturbed [the Supreme Court's] holding in *Knotts*[.]" *See United States v. Trice*, 966 F.3d 506, 518 (6th Cir. 2020).

To review a few of the critical facts of this case, recall that Ghiringhelli's monitoring of Hammond's location lasted only a matter of hours–from roughly 6 p.m. on October 30 until close to midnight, when officers were able to physically follow Hammond without the aid of the CSLI pings. This is very different from the 127 days of monitoring at issue in *Carpenter* and more similar to the monitoring of the discrete car trip at issue in *Knotts*. Furthermore, Ghiringhelli's real-time CSLI request only collected location data that Hammond had already exposed to public view while he travelled on public, interstate highways and into parking lots within the public's view. *See Knotts*, 460 U.S. at 281–82; *see also Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality op.) ("A car has little capacity for escaping public scrutiny.").

Crucially, unlike in *Carpenter*, the record of Hammond's (and Knotts') movements for a matter of hours on public roads does not provide a "window into [the] person's life, revealing … his familial, political, professional, religious, and sexual associations" to the same, intrusive degree as the

collection of historical CSLI. *Carpenter*, 138 S. Ct. 2217 (internal quotations omitted). Law enforcement used the real-time CSLI to find Hammond's location in public, not to peer into the intricacies of his private life. The records here and in *Knotts* do not suggest that law enforcement used either the real-time CSLI or the beeper to examine the defendants' movements inside of a home or other highly protected area. And, Hammond does not argue that he was in private areas during this time period. In *Carpenter*, law enforcement's surveillance became a "search" because the surveillance followed Carpenter long enough to follow him into, and record, his private life. But here, and in *Knotts*, law enforcement only followed Hammond on public roads, for the duration of one car trip. *See also United States v. Skinner*, 690 F.3d 772, 780–81 (6th Cir. 2012) (distinguishing "comprehensive tracking" from the collection of real-time CSLI to merely locate a drug-trafficking suspect) (superseded by statute on other grounds).

The *Carpenter* majority was particularly concerned with the "retrospective quality" of the data that law enforcement collected about Carpenter's movements. *See* 138 S. Ct. at 2218. "[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection." *Id.* The real-time CSLI collected in this case does not have the same "retrospective quality" of the historical CSLI in *Carpenter* and again, is much more akin to the beeper data in *Knotts*. Real-time CSLI collected over the course of several hours simply does not involve the same level of intrusion as the collection of historical CSLI.

Furthermore, one of the aggravating considerations in *Carpenter* was that the historical CSLI contravened society's expectations not only of their own privacy, but also of law enforcement's capabilities. *Carpenter* recognized that "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch[.]" *Id.* at 2217. The collection of historical CSLI in *Carpenter* was different because it would be too costly and difficult to follow a suspect for over four months. *See id.* As a result, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* But here, as in *Knotts*, the "government surveillance … amounted principally to the following of an automobile on public streets and highways." *Knotts*, 460 U.S. at 281. And in this case, society is fully aware that officers may follow and track a suspect's movements for several hours. In sum, law enforcement's ability to locate Hammond on public roads for a six-hour period using real-time CSLI is not inconsistent with society's expectations of privacy from law enforcement's prying eyes. *See Carpenter*, 138 S. Ct. at 2217.

Our conclusion here is buttressed by our decision in *United States v. Patrick*, where we held that the government did not violate the Fourth Amendment when officers used a cell-site simulator[7] to locate a suspect for whom officers had probable

---

[7] The Department of Justice Policy Guidance at the time defined a cell-site simulator as follows:

> A cell-site simulator receives and uses an industry standard unique identifying number assigned by a device manufacturer or cellular network provider. When used to locate a known cellular device, a cell-site simulator initially receives the unique

cause and two warrants (one for his arrest and one that "authorized [officers] to locate [the defendant] using cell-phone data"). 842 F.3d 540, 542, 545 (7th Cir. 2016). There, the defendant attempted to challenge the "validity of the location-tracking warrant by contending that his person was not contraband or the proceeds of a crime." *Id.* at 542. But we reasoned that officers "were entitled to arrest him without a warrant of any kind, let alone the two warrants they had … [because] probable cause alone is enough for an arrest in a public place." *Id.* (citing *United States v. Watson*, 423 U.S. 411 (1976)).

> A person wanted on probable cause (and an arrest warrant) who is taken into custody in a public place, where he had no legitimate expectation of privacy, cannot complain about how the police learned his location. Recall that the cell-site simulator (unlike the GPS device in *Jones*) was not used to generate the probable cause for arrest; probable cause to arrest Patrick predated the effort to locate him. … A fugitive cannot be picky about how he is run to ground. So it would be inappropriate to use the exclusionary rule[.]

*Id.* at 545.

---

identifying number from multiple devices in the vicinity of the simulator. Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone. When used to identify an unknown device, the cell-site simulator obtains signaling information from non-target devices in the target's vicinity for the limited purpose of distinguishing the target device.

*Patrick*, 842 F.3d at 543 (citing Department of Justice Policy Guidance: Use of Cell–Site Simulator Technology (Sept. 3, 2015) at 2).

While we acknowledge that *Patrick*'s facts and the legal landscape in which it was decided differ from the facts and legal landscape of this case, *Patrick* is still persuasive. Here, the district court found, and we agree, that the law enforcement officers involved in this case collectively had probable cause to arrest Hammond. *See United States v. Smith*, 989 F.3d 575, 582 (7th Cir. 2021) (collective knowledge doctrine "permits a stop at the direction of, or based on information relayed from, another law enforcement agency") (citing *United States v. Khan*, 937 F.3d 1042, 1052 (7th Cir. 2019)). "Police officers possess probable cause to arrest when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *United States v. Haldorson*, 941 F.3d 284, 290–91 (7th Cir. 2019) (quoting *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018)). As summarized by the district court:

> Collectively, the officers knew that a white male had committed several armed robberies; that the gun the robber had used in the earlier robberies traced back to a person named "Rex"; that "Rex's" phone number belonged to Rex Hammond; that Rex Hammond had several previous convictions for armed robberies; that the person described by Rex Hammond's driver's license was consistent with the race, height, weight, and build of the robber shown in the various videos; and that a car similar to what the videos suggested was the getaway car in the robberies was registered to Mr. Hammond.

Reviewing the totality of these circumstances, we have no trouble agreeing with the district court that the officers had

probable cause to arrest Hammond. *See id.* at 291 (analyzing probable cause under the totality of the circumstances).

Although Ghiringhelli did not seek a warrant, the fact that officers had probable cause to arrest Hammond is still relevant to the question of whether society is prepared to recognize Hammond's subjective expectation of privacy as "reasonable." *See Carpenter*, 138 S. Ct. at 2217. We conclude that his expectation of privacy was not reasonable in light of these facts. *Cf. United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (per curiam) (holding that the use of seven hours of GPS location data to locate a suspect for whom a valid search warrant had been issued was not a search "so long as the tracking [did] not reveal movements *within* the home (or hotel room), [did] not cross the sacred threshold of the home.") (emphasis in original).

It is also critical to acknowledge the stakes of what was essentially a slow-speed car chase here: Officers were pursuing an individual suspected of committing at least five successful armed robberies and two attempted armed robberies within a short period of time. The suspect had thus already committed several, violent felonies and was likely to do so again. Officers had reason to believe he was armed (he was) and likely to attempt another armed robbery (he intended to).[8]

To conclude, we hold that Detective Ghiringhelli did not conduct a Fourth Amendment "search" by requesting the real-time CSLI of a suspect for multiple armed robberies, for

---

[8] Recall that Hammond's passenger, Latendresse told officers that Hammond told her that they were "going to get some money."

whom officers had probable cause, where the officers only collected real-time CSLI for a matter of hours while the suspect travelled on public roadways, and law enforcement limited its use of the CSLI to the purpose of finding the armed suspect who they had reason to believe was likely to engage in another armed robbery. Hammond's purported, subjective expectation of privacy under these circumstances is not one "that society is prepared to recognize as 'reasonable.'" *See Katz*, 389 U.S. at 361. We stress that this holding, like that of *Carpenter*, is narrow and limited to the particular facts of this case.

As a result of this conclusion, none of the evidence stemming from Hammond's October 31 arrest must be suppressed: the collection of his real-time CSLI was not a search; the resulting traffic stop was valid under *Whren v. United States*, 517 U.S. 806 (1996); officers read Hammond his *Miranda* rights prior to his verbal statements, *Miranda v. Arizona*, 384 U.S. 436 (1966); and the physical evidence recovered from the car was discovered pursuant to a valid search warrant, *United States v. Clemens*, 58 F.3d 318, 321 (7th Cir. 1995). Thus, we also find no constitutional infirmity with the officers' actions after they had located Hammond (and Hammond does not identify any such infirmity).

### iv. Good Faith Exception

In the alternative, although we have concluded that the collection of Hammond's real-time CSLI was not a search, we also hold that the evidence collected as a result of his arrest should not be suppressed because law enforcement collected Hammond's real-time CSLI in good faith reliance on 18 U.S.C. § 2702. *See Krull*, 480 U.S. at 357 (extending *Leon*'s good faith exception to officer's good faith reliance on a then-

constitutional statute); *Davis*, 564 U.S. at 232 (extending good faith exception to reliance on binding circuit precedent). At bottom, "exclusion is not appropriate where 'the police act with an objectively reasonable good-faith belief that their conduct is lawful.'" *United States v. Kienast*, 907 F.3d 522, 527 (7th Cir. 2018), cert. denied, 139 S. Ct. 1639 (2019) (quoting *Davis*, 564 U.S. at 238 (2011)); *see also United States v. Rainone*, 816 F.3d 490 (7th Cir. 2016).

Section 2702(c)(4) permits telephone carriers to release records to a governmental entity, "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency."

Here, the district court credited Detective Ghiringhelli's testimony that he had a "good faith belief that an emergency was at hand."

> The robber thought to be Mr. Hammond had entered several places the public visits to shop and did so with his finger on (or at least adjacent to) the trigger. The timing of the previous robberies supported at least a strong possibility that another robbery would occur soon. Detective Ghiringhelli also was troubled by the video in which the robber set the handgun on the counter to collect money; Detective Ghiringhelli viewed that as unsafe handling of a firearm, which could pose a further risk to the public.

> Detective Ghiringhelli believed in good faith that a federal statute allowed him to act as he did, based on what he (and AT&T) believed to be an emergency, rather

than obtaining a warrant. Application of an exclusion-
ary rule is unnecessary under those circumstances.

While we review the district court's legal conclusion that De-
tective Ghiringhelli relied in good faith on § 2702 de novo, we
review the district court's factual findings for clear error.
*Edgeworth*, 889 F.3d at 353. Given that Detective Ghiringhelli
saw the suspect haphazardly handling his weapon, and even
had his finger on the trigger of the weapon upon entering the
stores he robbed, we cannot conclude that the district court's
factual findings regarding a pending emergency—that there
was a strong possibility of another robbery and that the detec-
tive was alarmed at the suspect's handling of his weapon—
were clearly erroneous. *See Thurman*, 889 F.3d at 363.

We also agree with the district court's legal conclusion that
Detective Ghiringhelli reasonably relied on § 2702 of the
Stored Communications Act in requesting Hammond's real-
time CSLI. At the time of the detective's request, *Carpenter* had
not yet explained the Supreme Court's concerns regarding the
use of historical CSLI, let alone real-time CSLI. Indeed, alt-
hough we had not yet opined on the issue, both the Eleventh
and Fifth Circuits had affirmatively held that defendants did
not have a reasonable expectation of privacy in their historical
CSLI. *See United States v. Daniels*, 803 F.3d 335, 351 (7th Cir.
2015); *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en
banc); *In re United States for Historical Cell Site Data*, 724 F.3d
600 (5th Cir. 2013).

Finally, our conclusion that Detective Ghiringhelli reason-
ably relied on the statutory authority of § 2702 is further rein-
forced by our decision in *Patrick*. There, we said that a suspect
"wanted on probable cause" could not "complain about how
the police learned his location." 842 F.3d at 545. We further

explained that from the defendant's perspective, "it is all the same whether a paid informant, a jilted lover, police with binoculars, a bartender, a member of a rival gang, a spy trailing his car after it left his driveway, *the phone company's cell towers*, or a device pretending to be a cell tower, provided the location information." *Id.* (emphasis added). Thus, pre-*Carpenter*, it also would have been reasonable for Ghiringhelli to rely on this binding circuit precedent in locating Hammond with his real-time CSLI. *See Davis*, 564 U.S. at 232.

**B. Felon-in-Possession Jury Instruction**

Hammond next argues that he is entitled to a new trial on his conviction for being a felon in possession of a firearm based on the Supreme Court's recent decision in *Rehaif*. 139 S. Ct. at 2200. "Before *Rehaif*, the federal courts of appeals had all held that [18 U.S.C.] § 922(g) required the government to prove a defendant knowingly possessed a firearm or ammunition, but not that the defendant knew he or she belonged to one of the prohibited classes." *United States v. Maez*, 960 F.3d 949, 953 (7th Cir. 2020) (citing *United States v. Williams*, 946 F.3d 968, 970 (7th Cir. 2020)). *Rehaif* "reached a different conclusion, holding that the statute requires the government to 'show that the defendant knew he possessed a firearm *and also* that he knew he had the relevant status when he possessed it.'" *Id.* (quoting *Rehaif*, 139 S. Ct. at 2194) (emphasis added).

At trial, Hammond stipulated to the fact that he was a convicted felon at the time of his crimes under *Old Chief v. United States*, but not that he knew that he was a felon, as required by *Rehaif*. *See* 519 U.S. 172, 190 (1997) (holding that the government could not offer evidence about the details of a defendant's prior conviction to prove the prior felony element of § 922(g) if the defendant offered to stipulate to the fact of

his prior felony conviction). In addition, the jury instructions reflected the pre-*Rehaif* understanding of § 922(g)'s requirements, but not *Rehaif*'s additional knowledge-of-status element. After the Supreme Court decided *Rehaif* in June 2019, Hammond moved the district court to vacate his felon-in-possession conviction and requested a new trial with a jury instructed on the offense as defined by *Rehaif*. Applying a harmless error analysis, the district court denied relief. The district court reasoned that if it ordered a new trial, one of two things would occur: Either the government would introduce evidence of Hammond's five prior felonies (including convictions for armed robbery), or (more likely) Hammond would stipulate to his knowledge of his felon status. Either way, the lack of a *Rehaif*-compliant instruction was harmless, because no reasonable jury would fail to convict Hammond in a second trial.

Hammond maintains that the district court erred in denying his motion and insists again that he is entitled to a new trial, with a jury properly instructed as to the post-*Rehaif* elements of § 922(g).

### 1. Standard of Review

To challenge the trial court's jury instructions, Federal Rule of Criminal Procedure 30 requires that the parties object to the jury instructions "before the jury retires to deliberate. … Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." Hammond did not object to the § 922(g) instruction prior to the jury retiring, so we review the district court's instructions for plain error. *See* Fed. R. Crim. P. 30, 52(b); *see also Maez*, 960 F.3d at 956 (2020) ("Failing to raise an objection to the jury instructions before deliberations start precludes appellate

review, except as permitted under Rule 52(b).") (internal quotations omitted) (citing *Johnson v. United States*, 520 U.S. 461, 464–66 (1997) (applying plain error review to jury instructions rendered incomplete by an intervening decision issued post-conviction)).

In *Maez*, we considered the appropriate remedy (and standard of review) for three defendants, who, like Hammond, were convicted of violating § 922(g) prior to *Rehaif* who asked us to vacate their sentences in light of *Rehaif*. 960 F.3d at 953. Like Hammond, each of the defendants stipulated to his prior conviction, but the jury did not hear any evidence regarding any defendant's knowledge of his felon status. *Id.* And the district court instructed the jury using the pre-*Rehaif* § 922(g) elements. *Id.* We applied plain error review and upheld the *Maez* defendants' convictions, as discussed more fully below. Hammond contends that his case is distinguishable from the defendants' cases in *Maez* because, unlike the *Maez* defendants, the district court had not yet sentenced him when the Supreme Court decided *Rehaif* in June 2019. (Hammond was tried in April 2019 and sentenced that July.) We see no reason to treat Hammond differently than the defendants in *Maez*. In reviewing objections to a trial court's jury instructions, the critical event is not when the defendant's conviction became final upon sentencing, but when the "jury retires to deliberate." *See* Fed. R. Crim. P. 30(d). Here, Hammond did not object to the jury instructions before the jury retired, so we review for plain error only.

Hammond resists this conclusion by cherry-picking a sentence from *Maez* in which we observed that "[i]f *Rehaif* had come down while these cases remained in the district courts, it would have been an abuse of discretion for a judge to refuse

to consider an untimely challenge to the indictment based on *Rehaif*." 960 F.3d at 957. Hammond's reliance on this sentence is misplaced. Hammond lifts this quote from a section of the opinion dedicated to defective indictments, not jury instructions. But when discussing the standard of review for incomplete jury instructions, the opinion relies on Rules 30 and 52(b) and applies Rule 52(b)'s plain error standard. *Id.* at 956 (citing *Johnson*, 520 U.S. at 464–66). Thus, we will review for plain error as we did in *Maez*.

### 2. Analysis

Having concluded that plain error review applies, we review the district court's instructions for "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Maez*, 960 F.3d at 956 (quoting *Johnson*, 520 U.S. at 466–67; *United States v. Olano*, 507 U.S. 725, 732 (1993)).

The government concedes, and we agree, that the district court plainly erred in instructing the jury on the elements of the § 922(g) offense in light of *Rehaif*. Although we do not fault the district court for failing to anticipate *Rehaif*'s holding, "[c]urrent law governs our review on direct appeal, including any issues reviewed for plain error. This principle applies with full force where an intervening decision has effectively added an element to a crime." *Id.* at 954 (citing *Henderson v. United States*, 568 U.S. 266, 276–77 (2013); *Johnson*, 520 U.S. at 467–68).

In *Maez*, we joined the Second Circuit in holding that the third prong of the plain error analysis—whether the error affected the defendant's substantial rights—must be analyzed based only on the trial record, and not on any materials not before the jury. *Id.* at 960–61 (citing *United States v. Miller*, 954 F.3d 551 (2d Cir. 2020)).

> This restriction to the jury record flows logically from the nature of a substantial-rights inquiry on direct review. The more abstract question of the defendant's actual guilt or innocence is not the issue. Rather, the appellate court asks what effect the error could have had on the verdict in the trial actually conducted.

*Id.* at 961.

Here, the trial record is light on whether Hammond subjectively knew of his felon status. Some jurors could certainly conclude that someone who had been convicted of a felony, as stipulated by Hammond, would know they were convicted of a felony. The only other evidence supporting this inference was that Hammond bought his weapons from Forsythe. Arguably, these purchases indicate that Hammond was trying to avoid the inquiries that a licensed gun dealer would have made, because he knew he was unable to legally possess a gun.

Even if Hammond has satisfied the first three prongs of the plain error analysis, however, we "retain[] discretion to leave an error uncorrected." *Id.* at 962 (citing *Olano*, 507 U.S. at 735). "A court should exercise its discretion at the fourth prong only if 'the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 736). "In sum, we have broad discretion

under prong four to leave even plain errors uncorrected where we have no doubt as to the ultimate result of further proceedings." *Id.* at 963. At this stage of the analysis, our discretion "implies some power to look beyond the trial record to assess an error's effect." *Id.* (citing *Miller*, 954 F.3d at 559–60). Still, "we confine our inquiry to the trial records and a narrow category of highly reliable information outside the trial records: the defendants' prior offenses and sentences served in prison, as reflected in undisputed portions of their PSRs [Pre-Sentence Investigation Reports]." *Id.* And, "if we are confident that the error in the jury instructions does not create a miscarriage of justice, we may decline to exercise our discretion to remand for a new trial." *United States v. Pulliam*, 973 F.3d 775, 781 (7th Cir. 2020).

Here, Hammond had several prior felony convictions, including other armed robberies, for which he received decades-long sentences. As in *Maez*, "[t]here is no doubt that a jury permitted to hear such evidence would find [the defendant] knew his felon status." *Maez*, 960 F.3d at 966, *see also United States v. Mancillas*, 789 F. App'x 549, 550 (7th Cir. 2020) (describing nine prior felonies as "a number [of felonies] that itself renders a lack of awareness all but impossible."). Accordingly, the incomplete § 922(g) instruction did not result in a miscarriage of justice, and we exercise our discretion not to correct the district court's unknowing error.

## C. Hobbs Act Robbery and Crimes of Violence under 18 U.S.C. § 924(c)

Third, Hammond asks the Court to reverse his convictions for brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c), because he maintains that Hobbs Act robbery is not a crime of violence under the statutory definition.

Hammond raises this argument for this first time on appeal, so we review only for plain error. Fed. R. Crim. P. 52(b); *United States v. Wehrle*, 985 F.3d 549, 556 (7th Cir. 2021).

Beginning with the statute, § 924(c) imposes a mandatory minimum sentence of five years in prison on "any person who, during and in relation to any crime of violence … for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A)(i). "[I]f the firearm is brandished," the defendant is subject to a mandatory minimum term of seven years in prison. *Id.* at § 924(c)(1)(A)(ii). The critical inquiry is therefore what constitutes a "crime of violence."

> For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* at § 924(c)(3)(A)–(B). Courts refer to subsection A as the "elements clause," while subsection B is the "residual clause." *See United States v. Davis*, 139 S. Ct. 2319, 2324 (2019).

Hammond acknowledges that we previously decided that Hobbs Act robbery, under 18 U.S.C. § 1951, *is* a crime of violence under the elements clause of § 924(c), but he urges us to revisit the issue in light of recent Supreme Court precedent

invalidating related criminal statutes, including the residual clause of § 924(c).

Hammond's challenge comes on the heels of a trilogy of recent Supreme Court decisions that have cast aside "residual clauses" in federal criminal statutes: In *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Court invalidated another provision of 18 U.S.C. § 924, specifically, subsection (e)(2)(B)(ii) of the Armed Career Criminal Act. That subsection defined "violent felonies" to include crimes involving "conduct" presenting "a serious potential risk of physical injury to another." The Court reasoned that the "indeterminacy of the wide-ranging inquiry required by the residual clause [of § 924(e)(2)(B)(ii)] both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law." *Id.* at 2557. The Court stayed this course in 2018 in holding that the statutory definition of a "crime of violence" under 18 U.S.C. § 16[9] was similarly unconstitutionally vague so as to deny a criminal defendant due process. *See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Finally, in 2019, the Court struck down the residual clause of the statute at issue here, § 924(c)(3)(B),

---

[9]    The term "crime of violence" means—

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C.A. § 16.

as unconstitutionally vague. *See Davis*, 139 S. Ct. at 2336. Critically, *Davis* attacked the constitutionality of this subsection's residual clause, but it left the elements clause, § 924(c)(3)(A), intact.

Based on *Johnson*, *Dimaya*, and *Davis*, Hammond urges this Court to find that Hobbs Act robbery is not a crime of violence under the elements clause, § 924(c)(3)(A). Hammond reasons that "Hobbs Act robbery can be committed by causing fear of future injury to property," but fear of future injury to property does not require the use or threat of any physical force as required by the elements clause.

We squarely decided this issue in *United States v. Anglin* in holding that Hobbs Act robbery is a "'crime of violence' within the meaning of" the elements clause of § 924(c)(3)(A). 846 F.3d 954, 965 (7th Cir. 2017) (sentence vacated by 138 S. Ct. 126 (Mem.) on other grounds; conviction confirmed as valid post-remand from the Supreme Court in 704 F. App'x 596 (Mem.)). "In so holding, we join[ed] the *unbroken consensus of other circuits* to have resolved this question." *Id.* (emphasis added) (collecting cases).

We reviewed this same question again in *Rivera* and reached the same conclusion: "[O]ne cannot commit Hobbs Act robbery without using or threatening force." *United States v. Rivera*, 847 F.3d 847, 849 (2017); *see also United States v. Brown*, 973 F.3d 667, 697 (7th Cir. 2020) (rejecting argument that Hobbs Act robbery is not a crime of violence). And, in a non-precedential order in 2019, we characterized an argument that Hobbs Act robbery is not a crime of violence (the argument Hammond makes here) as "frivolous" given that "we have confirmed that a Hobbs Act robbery is a crime of

violence under the still-valid 'elements clause' of § 924(c)." *United States v. Fox*, 783 F. App'x 630, 632 (7th Cir. 2019).

Moreover, this Court and our sister courts have consistently held that *Davis*'s invalidation of the residual clause of § 924(c) did not affect the continued constitutionality of the elements clause. *See United States v. Thomas*, 933 F.3d 685, 695, n.5 (7th Cir. 2019) ("The Supreme Court has now invalidated subparagraph (B)—the residual clause—as unconstitutionally vague. That decision does not affect this case. The bank-robbery count is covered by subparagraph (A)."); *see also United States v. Dixon*, 799 F. App'x 308, 309 (5th Cir. 2020) ("Davis held that the residual clause is unconstitutionally vague, but the elements clause remains intact."); *United States v. Kayarath*, 822 F. App'x 786, 790 (10th Cir. 2020) ("In sum, [this court has] held [that] Hobbs Act robbery satisfies § 924(c)'s elements clause and is thus categorically a crime of violence for purposes of that provision. [The defendant's] arguments challenging this holding have been consistently rejected, and the Supreme Court's decision in *Davis*, on which [the defendant] relied for authorization to commence this proceeding, does not call it into question."); *Levatte v. United States*, 805 F. App'x 658, 660 (11th Cir. 2020).

We decline Hammond's invitation to revisit our decisions in *Anglin*, *Rivera*, and *Brown*. Hammond has not presented any new arguments regarding the continued validity of the elements clause of § 924(c) and its inclusion of Hobbs Act robbery in the definition of a "crime of violence" that would warrant departing from our precedents and the unanimous conclusion of our sister circuits. Accordingly, the district court did not err in putting Hammond's § 924(c) charges to the jury

and sentencing him accordingly when the jury found Hammond guilty of both counts.

**D. The Career Offender Enhancement of the Sentencing Guidelines**

Finally, Hammond disputes the district court's adoption of the presentence investigation report ("PSR"), to the extent that it classified him as a career offender under United States Sentencing Guideline § 4B1.1, for committing the instant offense of Hobbs Act robbery and two prior violent felony offenses.

Section 4B1.1 classifies a defendant as a "career offender" if:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). If a defendant is so classified, the Guidelines assign substantially elevated offense levels to the defendant. In this case, without the career offender enhancement, Hammond's offense level was 34. This would have resulted in a Guidelines range of 235 to 293 months in prison, based on his category V criminal history. But because the probation officer found Hammond qualified for the career offender enhancement under § 4B1.1 (and he did not accept responsibility for his crimes under § 3E1.1), he was subject to a Guidelines recommended range of 360 months to life in prison.

Hammond contends that the district court erred as a matter of law in accepting the probation officer's application of the career offender enhancement to his case, because Hobbs Act robbery cannot be a crime of violence under § 4B1.2(a). Section 4B1.2(a) defines a "crime of violence" as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year that—

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a). Subsection (1) is referred to as the "use of force" clause; subsection (2) is referred to as the "enumerated offenses" clause. Here, the government concedes that Hobbs Act robbery does not qualify under the Guidelines' use of force clause. So, Hammond turns to the enumerated offenses clause and argues that Hobbs Act robbery criminalizes more conduct than generic robbery or extortion do, so, under the categorical approach, Hobbs Act robbery does not qualify as a crime of violence under the enumerated offenses clause either. *See United States v. Maxwell*, 823 F.3d 1057, 1060 (7th Cir. 2016) (applying the categorical approach to determine whether the defendant's prior conviction qualified as a crime of violence under § 4B1.1).

We recently joined four of our sister circuits in deciding that Hobbs Act robbery cannot be the predicate crime of

violence for § 4B1.1's career offender enhancement. *See Bridges v. United States*, 991 F.3d 793 (7th Cir. 2021); *see also United States v. Eason*, 953 F.3d 1184 (11th Cir. 2020); *United States v. Rodriguez*, 770 F. App'x 18 (3d Cir. 2019), cert. denied, 140 S. Ct. 843 (2020); *United States v. Camp*, 903 F.3d 594 (6th Cir. 2018), cert. denied, 139 S. Ct. 845 (2019); *United States v. O'Connor*, 874 F.3d 1147 (10th Cir. 2017).

Here, the Defendant forfeited this argument by failing to bring the question before the district court in the first instance. On plain error review, we find that the district court's sentence was not impacted by the Guidelines, and we therefore affirm Hammond's sentence.

### 1. Forfeiture and Waiver

Hammond acknowledges that he did not raise this argument below and asks us to review his sentence, and the district court's application of the Guidelines' career offender enhancement, for plain error. The government counters that Hammond waived the argument, extinguishing all appellate review.

"Waiver is the intentional relinquishment of a known right. … Forfeiture is the failure to timely assert a right." *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005). The line between waiver and forfeiture can be "blurry." *United States v. Young*, 908 F.3d 241, 246 (7th Cir. 2018). To waive an argument on appeal, a defendant must have had some strategic reason for waiving the argument in the trial court. *See, e.g., United States v. Jenkins*, 772 F.3d 1092, 1096 (7th Cir. 2014). "[T]he waiver principle is construed liberally in favor of the defendant" and this court is "cautious about interpreting          a          defendant's          behavior          as          intentional

relinquishment." *United States v. Barnes*, 883 F.3d 955, 957 (7th Cir. 2018). Accordingly, we have required something more than just a defendant's failure to object to some part of the PSR to find that the defendant waived an argument on appeal. *See Young*, 908 F.3d at 246–47 (finding waiver where trial counsel had "emphasized repeatedly…[that he] made a strategic decision to stipulate to fraudulent conduct"); *Barnes*, 883 F.3d at 958 (finding waiver where the defendant "had a targeted strategy [whereby he] focused exclusively on his criminal history category and raised a single objection to it."); *United States v. Fuentes*, 858 F.3d 1119, 1121 (7th Cir. 2017) (finding waiver where the defendant "explicitly agreed to the [sentencing] enhancement in his written plea agreement").

Here, Hammond's trial counsel lodged several objections to the PSR, including to various sentencing enhancements for Hammond's use of a firearm. In his sentencing memorandum, Hammond recognized the powerful impact of Hammond's classification as a career offender under § 4B1.1 of the Sentencing Guidelines—counsel acknowledged that even if the court were to agree "with all of his sentence enhancement objections, it would not likely change the outcome of his sentence because he qualifies as a Career Offender under U.S.S.G. § 4B1.1." Yet counsel did not object to the career offender classification and stated at the sentencing hearing that he had made all of his objections.

Keeping in mind that "[t]he touchstone of waiver is a knowing and intentional decision," *Jaimes-Jaimes*, 406 F.3d at 848, defense counsel's sentencing memorandum and his exchange with the district court do not support a finding that trial counsel intentionally waived Hammond's career offender argument. Trial counsel's conduct does not reveal a

strategy, or intent, for waiving the § 4B1.1 objection. To the contrary, trial counsel's acknowledgement that all of his other objections would not impact Hammond's Guidelines range in the face of the § 4B1.1 enhancement demonstrates that he had no strategy for failing to object to that particular enhancement. "We can conceive of no reason why [the defendant] would have intentionally relinquished an objection certain to result in a lower … sentencing range, nor has the government offered one." *Jenkins*, 772 F.3d at 1096. "If the government cannot proffer any strategic justification for a defendant's omission, we will presume an inadvertent forfeiture rather than an intentional relinquishment." *United States v. Robinson*, 964 F.3d 632, 642 (7th Cir. 2020) (quoting *United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019)). Finally, it is worth noting that we only recognized that Hammond's argument that Hobbs Act robbery is not a crime of violence under the Guidelines as "not frivolous" as of July 1, 2019, just fourteen days before Hammond's sentencing. *See United States v. Tyler*, 780 F. App'x 360, 363 (7th Cir. 2019). For these reasons, we conclude that Hammond forfeited, rather than waived, his § 4B1.1 argument.

### 2. Plain Error Analysis

"Normally we review a district court's application of the Sentencing Guidelines de novo." *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008) (citing *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008)). But because Hammond forfeited his argument by failing to raise it before the district court, we review for plain error. *Id.*

As noted above, the district court commits plain error when there is "(1) an error or defect, (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and

seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *United States v. Goodwin*, 717 F.3d 511, 518 (7th Cir. 2013). "We have repeatedly held that 'a sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence.'" *Jenkins*, 772 F.3d at 1097 (quoting *United States v. Love*, 706 F.3d 832, 841 (7th Cir. 2013)). Ordinarily, we presume that "the improperly calculated Guidelines range influenced the judge's choice of sentence," and therefore affected the defendant's substantial rights. *United States v. McGuire*, 835 F.3d 756, 760 (7th Cir. 2016) (quoting *United States v. Adams*, 746 F.3d 734, 743 (7th Cir. 2014)). However, this "presumption can be overcome" when the sentencing judge makes clear that it did not rely on the Guidelines in fashioning its sentence. *See id.*; *see also Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346–47 (2016) ("The record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate. And that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines."); *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008) ("A sentence based on an incorrect Guideline range constitutes an error affecting substantial rights and can thus constitute plain error, which requires us to remand *unless we have reason to believe that the error did not affect the district court's selection of a particular sentence*.") (emphasis added) (citing *United States v. Wallace*, 32 F.3d 1171, 1174 (7th Cir. 1994)).

Regardless of the district court's error in applying the § 4B1.1 enhancement to Hammond, we are convinced that the Guidelines range did not affect the district court's sentence. In imposing Hammond's sentence, the district court observed that Hammond had effectively served a ten-year sentence on his most recent Indiana conviction for armed robbery. The district court reasoned that "[g]iven Mr. Hammond's past armed robberies, no robbery sentence of less than 10 years in this case for any of the robberies would be reasonable." After committing his first robbery, "he kept going," so the court thought that "allowing incremental increases for each of the later robberies, when that's taken into account, a 10-year sentence on Count 1 [for the October 6 robbery] is enough but not greater than necessary to satisfy the purposes of the sentencing statute." The court therefore continued to assign incrementally increasing sentences for the October 7, 9, 25, and 27 robberies, culminating in an 18-year sentence for the final robbery.

Beyond the Hobbs Act counts, Hammond's conviction of two counts of brandishing a firearm during a crime of violence each carried a mandatory minimum sentence of seven years in prison. And Hammond's felon-in-possession conviction carried a mandatory minimum sentence of fifteen years in prison. The court declined defense counsel's request to run those sentences concurrently to his sentence for the robbery charges, and instead imposed the 29-year sentence for the weapons charges to run consecutively to the 18 years it imposed for the robbery charges.

In explaining this sentence, the district court unequivocally stated that it would have imposed the same sentence regardless of the recommended Guidelines range:

> I did arrive at this sentence solely by considering the seriousness and impact of the crimes of conviction and Mr. Hammond's prior crimes. I calculated the Guideline recommendation, as I'm required to do, but ultimately did not use it in determining this sentence. So, I can say, as the Government requested, that I would impose the same sentence even if the Guideline calculation produced a different recommendation[.]

Beyond simply stating that the court would have imposed the same sentence regardless of the Guidelines, the district court's explanation of how it fashioned its sentence illustrates that the court did not, in fact, rely on the Guidelines. Indeed, the district court could not have been any clearer that its calculation of the appropriate sentence did not depend on the Guidelines range but was instead based on the seriousness of his current and past crimes, Hammond's danger to the community, and the lack of deterrence that prior, shorter sentences had had on Hammond. Thus, the sentencing court did not just pay lip service to the notion that it would impose the same sentence regardless of the Guidelines, it calculated its sentence without the aid of the Guidelines. We therefore have "reason to believe that the error in no way affected the district court's selection of a particular sentence" and affirm Hammond's sentence. *Jenkins*, 772 F.3d at 1097.

### III. Conclusion

In light of the foregoing, Hammond's conviction and sentence are

AFFIRMED.