# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2025

Lyle W. Cayce
Clerk

No. 23-10797

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RODRIGO NAPOLES BRISEÑO,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CR-4-2

Before CLEMENT, GRAVES, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[*]

Rodrigo Napoles Briseño challenges the denial of his motion to suppress statements and physical evidence that he contends were obtained as a result of deficient *Miranda* warnings and an unlawful search. We AFFIRM.

I

On Friday, December 16, 2022, W.Y., an individual in Baltimore, Maryland, called the FBI National Threat Operations Center and reported

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-10797

that his nineteen-year-old wife and two-year-old daughter were being held captive in Dallas, Texas, by cartel members. During the call, W.Y. explained that he paid to have his wife and child smuggled into the United States, a drug cartel kidnapped them when they entered the country on December 1, and the cartel threatened to kill them if a $34,000 ransom was not paid. He also stated that he had spoken to his wife on December 14, and he was receiving calls from her every other day from a cellular telephone number ending in "2612" ("target number" or "target phone").

### A.     Initial Investigation[1]

W.Y.'s call was initially routed to the FBI's Fort Worth field office at 4:37 p.m. Central Standard Time (CST). At 6:37 p.m. CST, the case was referred to the Baltimore field office through the FBI's classified computer system. Because the referral went to the physical computers based in Baltimore, and no one was in the office at 6:37 p.m. CST, or 7:37 p.m. Eastern Standard Time (EST), that Friday night to receive or review the referral, no agent in Baltimore acted upon it until the following Monday morning, December 19, when the case was assigned.

Once the assigned agent received and reviewed the information provided by W.Y., she immediately began investigating the case. The agent indicated that she would have immediately started working on the case and contacted W.Y. that Friday night had she received the referral on December 16. She believed the circumstances on Monday morning compelled immediate action for several reasons:

_____

[1] Most of the facts about the initial investigation are taken from the assigned Baltimore FBI agent's sworn declaration, filed with the Government's response to Briseño's reply brief in support of his motion to suppress. The Government was ordered to respond to a new argument raised in the reply brief by the time of the suppression hearing, which was scheduled for the next day.

No. 23-10797

> I believed the victims were in imminent danger and action needed to be taken immediately. The fact that one of the victim's (sic) was a child elevated the danger. In addition, because the demanded ransom had not been addressed for several days, the situation was, from my perspective, increasingly dangerous. Further, the allegation that the victims were being held by members or associates of an unidentified cartel also contributed to my rising concern for the safety of the victims.

The agent's declaration described the investigation that immediately ensued given this backdrop:

> 11.  By 11 a.m. EST on that same day, I met with my team and arranged a call to W.Y., where we received additional information from him over the telephone.
>
> 12.  We did this despite language barriers with W.Y.
>
> 13.  I also sought corroborating information related to the facts that W.Y. was relaying and asked W.Y. to visit the FBI's Baltimore Field Office later that afternoon at 2 p.m. EST and he agreed.
>
> 14.  W.Y. later texted me and explained that he could not make the planned meeting because he did not have transportation or money to travel to the office.
>
> 15.  We rescheduled the meeting for the following morning (December 20, 2022) at 9 a.m. EST.
>
> 16.  Nonetheless, in the meantime, and on the same day that I received notice of the allegations (Monday, December 19, 2022), I consulted with other agents in my office and those who specialized in GPS pings.[2]

---

[2] Global Positioning Data (GPS) data "reveal the latitude and longitude coordinates of the cell phone, regardless of whether a call is in progress, as identified by satellites orbiting the Earth that connect to the phone." *United States v. Riley*, 858 F.3d

No. 23-10797

17.  In particular, I worked with FBI Special Agent [ ].

18.  Based upon these conversations, and the exigent nature of the allegations, that afternoon (Monday December 19, 2022), Special Agent [ ] submitted an exigent request form to T-Mobile.

19. Baltimore FBI agents also performed additional research regarding W.Y., F.P.[3] and the allegations, including social media research, database checks, and consultations with other offices on Monday, December 19, 2022.

The pre-printed exigent request form contained the following explanation of the emergency:

> [REDACTED] and her daughter [REDACTED] are possibly being held against their will in Arlington, TX. Kidnappers demanded $40,000 to released (sic) the victims. Phone call made from T-Mobile #[REDACTED]-2612.

It requested subscriber information, call detail records with cell sites for the last 48 hours, continuous ping location every ten minutes for up to 48 hours, and "timing advance with cell site" from December 17, 2022, to the present, for the target number. The form was signed and dated December 19, 2022; it has no timestamp indicating what time it was submitted to T-Mobile. The FBI started receiving the requested ping data later that same day.

The assigned agent's first internal report, dated December 19, 2022, listed "Guardian," "Sentinel," and "DIVS" queries performed, several of which yielded results for Briseño.[4] The report does not specify the time of these inquiries. It does not mention the exigent request made to T-Mobile.

_____

1012, 1014 n.1 (6th Cir. 2017). "[T]o ping a cell phone is to send a signal, so to speak, to identify where the phone is at any given moment." *Id.*

[3] F.P. appears to be W.Y.'s wife.

[4] There is no explanation in the record of what these queries are or what they entail.

According to a later search warrant affidavit and the criminal complaint, "[r]ecords from an FBI Database identified that the target phone was used in a previous kidnapping case," and the "wire transfers associated with the previous kidnapping case" identified Briseño as "[t]he person associated with the phone."[5]

The next morning, December 20, W.Y. came to the Baltimore office, where agents interviewed him with the assistance of a translator. The assigned agent's second internal report dated December 20, 2022, stated that W.Y. "provided consent to search his phone and record any phone calls that may have come in from the kidnappers" and he "was fully cooperative with the interview." He told the FBI he last spoke with his wife the previous evening, and she and their child were still being held in the same place in Texas. Unlike the first internal report, this report also noted that "emergency pings" had been requested on the target number. As of that afternoon, pings confirmed the target phone's location in the area of Fort Worth, Texas.

The agent who submitted the exigent request form made an additional exigent request to T-Mobile on the morning of December 21, "while agents in Baltimore were attempting to obtain a search warrant to locate the device." Shortly thereafter, FBI agents from the Dallas office used the pings to track the target phone as it traveled north from Fort Worth. Based on their investigation, they believed that Briseño would be driving a vehicle registered to a relative.

At approximately 2:00 p.m., Dallas agents tracked the phone to Missouri, and they contacted the FBI office in Kansas City, Missouri for assistance in locating the vehicle. Less than an hour later, at approximately

---

[5] Neither the search warrant affidavit dated December 21, 2022, nor the criminal complaint, dated December 27, 2022, state when or how agents learned the information.

No. 23-10797

2:53 p.m., local authorities stopped the vehicle. During the stop, they identified Briseño as the driver of the vehicle and the owner of the target phone, and they arrested him. Once the target phone was located, the pings were discontinued.[6]

## B.    Interview

Immediately after the arrest, FBI agents took Briseño to a local jail and booked him into custody. None of the arresting officers spoke Spanish, but the agent interviewing Briseño was a "level two Spanish speaker," which meant that although he was not fluent, he was able to converse in Spanish. Before the interview, another agent expressed fear for the life of the victims and stated that time was of the essence. The five-hour interview was recorded by video.

The entire interview was conducted in Spanish. The video begins with Briseño and two agents entering the room and sitting at a table across from each other. Briseño's face is not visible in the video, and his head is not always in view of the camera. Both the video and transcript of the interview proffered by the Government show the interviewing agent advising Briseño that authorities were investigating a ransom demand for a woman and child.

> AGENT: And, uh [beep] this is the—uh, the—I am not certain why. But, uh, this person is using this cell phone. [beep] Do you understand? [noise]
>
> BRISEÑO: Oh, no, n—

---

[6] In an internal report dated January 9, 2023, the agent who submitted the exigent request form to T-Mobile noted that "[h]istorical call detail record analysis was conducted on the historical records associated with the [target number]." Briseño raised the issue of the exigent request in his reply to the motion to suppress, arguing the search warrant was based on "exigent pings of the Target Phone" obtained in violation of the Fourth Amendment. He did not mention or address the historical records.

No. 23-10797

AGENT:  Yes, yes—

BRISEÑO:  But—[stammers] uh, mm-mm, my phone?

AGENT:  Yes. And, uh, we at this moment, uh, we do not stay [sic] uhm, carry [sic] you. We only want to find [banging noise] this, this girl, and her mother. Her mother is, is the 19-year-old young woman.

The video shows Briseño pointing to his phone, which is on the table next to the agent, before responding, "Uh-huh." The interview continued:

AGENT:  Uhm, and, that is why we stay [sic] uh, learn, uh, because—or, or where are these, [chimes] these two people.

BRISEÑO:  Um-hmm.

AGENT:  And if you can help us with this, uhm, it is going to be very useful. And, and like you know, I can, uhm, talk that or read—but you know that you do not have to talk with us.

BRISEÑO:  Um-hmm.

The video then shows the other agent handing a yellow card to the interviewing agent, which contained the *Miranda*[7] warnings in Spanish.[8] While holding the card, the agent then tells Briseño:

_____

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[8] The English translation of the card provides as follows:

DECLARATION OF RIGHTS
Before we ask you any questions, you must understand:
- You have the right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
Do you understand?
Are you willing to answer some questions?

> Uh, if you do not have enough money to pay an attorney, uh, the United States Government [stammers] are going to pay, or will pay for an attorney. Uh, and if you do not, uh, want to talk, it is not necessary for you to talk. You can, uhm, remain silent.

Briseño responds "Um-hmm," and the agent continues:

> Uhm, but, and you can read this if it is, it is better—because, like you know, I cannot speak, uh, Spanish very well. But, at this moment, the thing that is more important for us and for you is to locate these, these two people. Nothing else.

During this explanation, the video shows the agent placing the card on the table in front of Briseño. Three seconds later, Briseño slides the card towards him, leans forward in his chair, and picks up the card with both hands. His thumbs are aligned with the text at the top of the card. Briseño appears to look at the card for 12 seconds. After the agent stops talking, Briseño continues looking in the direction of the card for eight more seconds.

The agent then tells Briseño that he and the other agent have frequently worked together on cases like this. In the video, Briseño continues to look towards the card for two seconds. He then shifts his thumbs from the top of the card to the bottom, looks in the direction of the card for two to three more seconds, looks up at the agent, and responds, "Mm-hmm—".

> The interview continued:
>
> AGENT:  —and like, uhm, you have said—generally, a person like you, who is making phone calls, is not involved. Uh, it is an, another man—
>
> BRISEÑO:  Hmm—
>
> AGENT:  —very bad [exhales]
>
> BRISEÑO:  Hmm.
>
> AGENT:  —and for that reason, uh, when, a, a man like you has the time to talk—

BRISEÑO:  Mm—

AGENT:  —it is better to talk [banging noise] simply, that way you can say, "I am not part of this—this."

BRISEÑO:  Mm—

AGENT:  But, it is more important at this moment to find the, the kids.

BRISEÑO:  Mm-hmm.

After the other agent whispered information about the address to the agent, the interview continued:

AGENT:  Yes, and, uh, in, in the past, when you were in, in Texas—

BRISEÑO:  Uh-huh.

AGENT:  —where, uh, did you live, you?

BRISEÑO:  Uh, the address is, is with a brother, at—

The video shows that the card remained on the table in front of Briseño for two minutes and 16 seconds until it was removed by the other agent. As the interview continued, Briseño explained that he and his cousin were a part of an organization that transported noncitizens across the border in exchange for money; that W.Y. was lying about his wife and child being kidnapped;[9] that W.Y. had instead refused to pay the second half of the transportation fee so the organization would have enough money to take them to Baltimore; and that they were not being held against their will. He did not know who oversaw the operation or whether people in the

_____

[9] Briseño also showed the agents some of the messages with W.Y. and pictures of W.Y.'s daughter that were sent to his wife's aunt, including one of her eating out the previous night. The interviewing agent commented that she appeared happy. Briseño does not cite to this evidence in his brief, and he does not rely on it in support of any of his arguments on appeal.

organization were with a cartel. He also provided the address to a house on Miller Avenue in Fort Worth ("Miller House") where the victims were located. Briseño stated that his cousin and another person owned the house, and that they were currently there with W.Y.'s wife and daughter and two other females.[10]

## C.    Warrant

Later that day, a Fort Worth Police Department Officer assigned to an FBI Task Force requested and received a warrant to search the Miller House. Notably, the affidavit for the warrant incorrectly stated that "a warrant was issued for information from [the t]arget phone to T-Mobile." When agents searched the Miller House, they discovered W.Y.'s wife and child, 20 other individuals, and multiple pieces of physical evidence.

## D.    Suppression Motion

Briseño was indicted on one count of conspiracy to transport and harbor illegal aliens for the purpose of commercial advantage and private financial gain and one count of transporting illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (v).

Briseño filed a motion to suppress incriminating statements he made during the custodial interrogation and the evidence agents had discovered in the Miller House. He argued that he had not knowingly waived his rights

---

[10] During the interview, Briseño's cousin called his phone and left the following voicemail:

> What's up, cuz? How's it going? What's going on or what? Answer the f***ing phone. Are you asleep, dammit?

The interviewing agent listened to the voicemail, translated it for the other agent, and told him that, based on the cousin's tone, he could tell there were no problems. Later, when a different agent asked about Briseño getting more calls, the interviewing agent told him there were no other calls, paraphrased the cousin's voicemail, and said "they were happy."

because he was not issued proper *Miranda* warnings, that the exclusionary rule should apply, and the good-faith exception should not apply, to evidence obtained based on those statements.

In his reply to the Government's response in opposition to his motion, Briseño argued for the first time that the evidence discovered pursuant to the warrant should be suppressed because agents violated the Fourth Amendment by obtaining cell phone location information without a warrant to find and arrest him. He also argued that the good-faith exception should not apply to evidence obtained in violation of the Fourth Amendment and that the affidavit supporting the warrant to search the Miller House falsely stated that a warrant had been obtained to track his phone.

### E.    Suppression Hearing

The district court held a hearing on the motion to suppress at which the interviewing agent testified. The Government and the defense both submitted videos of the interrogation; the Government also provided a translated transcript as an exhibit, as well as a summary of the interview. The video and transcript were admitted without objection.

The first four minutes of the video with the transcript were played at the hearing. The interviewing agent testified that when explaining the situation to Briseño at the beginning of the interview, Briseño looked at him, and "from nonverbal cues[,] it appeared to [him] that he understood what it was that [the agent] was saying to him." When asked about the transcript and the references to Briseño saying, "uh-huh or huh-uh, things like that," the agent testified that he heard those responses and viewed them as Briseño affirming his understanding of what he was saying.

The Government then played the part of the video involving the *Miranda* warning before questioning the agent about it:

GOVERNMENT: Based on what you saw in that room that day and based on your experience and training as an FBI agent, as a trained lawyer, as other things, do you have any doubt that he understood the rights that you were reading to him and providing to him in written form?

AGENT: I don't.

GOVERNMENT: And why do you have that belief?

AGENT: Because as I read through he said "uh-huh," "uh-huh." There were these, as I said, sort of nonverbal cues. He looks at the card. He's looking at it for a period of time. He sets the card down, leans back and I think, okay, he's ready for me to ask him the questions. He doesn't say, "I can't read this," he doesn't say, "I don't want to speak." He doesn't do any of those things.

GOVERNMENT: Was it one thing that led you to believe he understood the rights that you were stating and letting him read or was it the totality of the circumstances that day?

AGENT: Yeah, it was the totality of the circumstances, yes, sir.

GOVERNMENT: Would that include both what he said verbally as well as what you personally observed?

AGENT: Yes, sir.

The agent continued explaining that, based on his observations during the interview and on his training and experience, he had no doubt that Briseño fully understood the rights he read to him and provided to him in written form, and that Briseño decided to speak with him after reading those rights.

After the hearing, the district court issued an order denying the motion to suppress. As to the alleged *Miranda* violations, the court found the interviewing agent's testimony "about the circumstances surrounding the interrogation" credible, persuasive, and uncontroverted. It found that

Briseño was properly *Mirandized* before the interrogation, he "did read the yellow card that listed his rights in Spanish," and he "knowingly and voluntarily waived his *Miranda* rights, albeit implicitly, when he began answering [the agent's] questions regarding the ransom." The court also found that the evidence established that Briseño was literate. Specifically, the agent's testimony that Briseño "referenced text messages he received using WhatsApp numerous times during the interrogation and showed the FBI agents screenshots of text messages he had exchanged in the past" and that Briseño had asked him to "clarify what he was saying multiple times during the interrogation," as well as the interview video that suggested that Briseño had "looked at the card for around twenty seconds and moved his left thumb down the side of the card as if he was using his thumb as an indicator of each section he was reading." The court determined that "the totality of the circumstances surrounding the interrogation support a finding that [Briseño] read and comprehended his *Miranda* rights and that he implicitly waived his rights when he began to answer questions regarding the ransom demand," and that his "statements were not the result of force, threats, or coercion."

The court next found that even if the *Miranda* waiver was unknowing and his custodial statements were used to obtain the search warrant for the Miller House, evidence discovered from that search was still admissible because the nontestimonial fruits from his interrogation "do not implicate the Self-Incrimination Clause." The court alternatively found that even if the evidence was excludable based on a *Miranda* violation, it would still be admissible under the good-faith exception because Briseño had failed to show that the affiant who applied for the warrant or the officers executing the warrant was aware of any possible *Miranda* violation.

As to Briseño's challenge concerning the tracking of his phone, the district court initially noted that because the evidentiary objection had been raised for the first time in his reply brief, it could strike the argument "as

procedurally waived and as an improper dilatory tactic." Nevertheless, it determined that the FBI's warrantless tracking of Briseño's phone did not violate his Fourth Amendment rights because it was justified by exigent circumstances. Specifically, the court found that the information provided to the FBI about the alleged kidnapping of a nineteen-year-old woman and her two-year-old child who were the subject of death threats if a ransom was not paid supported a reasonable belief that the victims were in a life threatening situation, that the FBI's initial investigation delay was the result of an oversight, that upon notice of the situation agents acted with urgency to locate the victims, and that the warrantless tracking was objectively reasonable due to exigent circumstances.

## F.    Plea

Briseño subsequently entered a conditional plea of guilty pursuant to a plea agreement, in which he reserved the right to challenge the denial of the motion to suppress on appeal. *See* FED. R. CRIM. P. 11(a)(2). After granting the Government's motion for a U.S.S.G. § 5K1.1 departure based on Briseño's substantial assistance, the district court varied upwards and sentenced him to 84 months of imprisonment and three years of supervised release. Briseño timely filed a notice of appeal challenging the denial of his suppression motion.

## II

"When reviewing a denial of a motion to suppress evidence, this Court reviews factual findings for clear error and the ultimate constitutionality of law enforcement action de novo." *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Bass*, 996 F.3d 729, 736 (5th Cir. 2021) (citation omitted). "Factual findings are clearly erroneous only if a review of the record leaves this Court

with a 'definite and firm conviction that a mistake has been committed.'" *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (quoting *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)).

Evidence is viewed in the light most favorable to the prevailing party. *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005). Further, this court defers to factfinders who hear live testimony and will uphold the district court's ruling if there is a reasonable view of the evidence supporting it. *See United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023). "We may affirm the district court's decision on any basis established by the record." *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010).

## III

Briseño first argues that the district court erred by denying his motion to suppress his custodial statements because he did not knowingly waive his *Miranda* rights.[11]

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. "This requirement is most commonly satisfied by giving the defendant the customary *Miranda* warnings: that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one." *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994). "There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*." *United States v.*

---

[11] The Government contends that it is unnecessary to reach the merits of the *Miranda* issue because, even assuming that Briseño's statements were not *Mirandized* and knowing, that would not preclude admission of evidence discovered from that search warrant. On appeal, Briseño argues only that his custodial statements themselves should be suppressed due to the insufficient *Miranda* warnings.

No. 23-10797

*Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (citing *California v. Prysock*, 453 U.S. 355, 359 (1981)).

The protections offered by *Miranda* may be waived, so long as the waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To be valid, the waiver of *Miranda* rights must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"[12] and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also Oregon v. Elstad*, 470 U.S. 298, 316 (1985) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

In determining whether a waiver "constitute[s] a knowing and intelligent relinquishment or abandonment of a known right or privilege," a court must consider "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (citations omitted). We have recognized that a suspect's language skills is a relevant factor to be considered in this

---

[12] Briseño does not argue on appeal that he was subjected to intimidation, coercion, or deception. Instead, he focuses on the second prong of the inquiry, arguing he did not knowingly and intelligently waive his *Miranda* rights.

inquiry. *See United States v. Garcia Abrego*, 141 F.3d 142, 171 (5th Cir. 1998); *United States v. Hernandez*, 200 F. App'x 283, 288 (5th Cir. 2006).

A waiver need not be explicit. *North Carolina v. Butler*, 441 U.S. 369, 373–74 (1979). Rather, the "waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (quoting *Butler*, 441 U.S. at 373). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). The government bears the burden of proving a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

The video of Briseño's interview shows that before it began, he was orally read some, but not all, of his *Miranda* rights in broken Spanish. He was then handed a card, which the interviewing agent testified contained the *Miranda* warnings written in Spanish. Briseño held the card, appeared to look at it for 25 seconds, and did not ask any questions. According to the agent's testimony, which the court found credible and persuasive, Briseño appeared to be reading the card. *See Gibbs*, 421 F.3d at 356–57 (explaining that this court must adhere to the clearly erroneous standard to an even greater extent when the district court's denial of a motion to suppress is based upon live witness testimony).

Although the video does not show Briseño's face, it does not contradict the testimony that he appeared to read the card. The video shows that after Briseño put the card on the table, he repositioned himself in his chair and answered the agent's questions. The agent testified that he began asking Briseño questions at that point because he had no doubt that Briseño fully understood his rights and had decided to speak with him. He noted that

Briseño said "uh-huh" while he read the rights to him, and that after looking at the card, Briseño did not say he was unable to read it or that he did not want to speak. He testified that, based on his experience and training, he did not observe anything to indicate that Briseño did not understand the rights that he read to him and that were provided to him in written form. The district court, which had the benefit of observing the agent's demeanor, found his testimony credible and persuasive, and this credibility determination is entitled to deference. *See United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005) ("Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses.").

The district court found that Briseño's repeated references to text messages throughout the interrogation suggested that he was literate, which goes to his ability to read the card, and that the video of Briseño looking at the card for at least twenty seconds and the uncontradicted agent testimony that Briseño appeared to be reading it suggested that Briseño had read the card. It also found that the multiple times that Briseño asked the agent to clarify questions during the interrogation indicated his ability to comprehend the rights on the card, despite any language problems because "his behavior throughout the interrogation suggests that he would have stopped to clarify what the card was saying before moving on, as he did at other times." The court concluded that "the totality of the circumstances surrounding the interrogation support" that Briseño "read and comprehended his *Miranda* rights" and "implicitly waived his rights when he began to answer questions regarding the ransom demand" and that his statements "were not the result of force, threats, or coercion."

Viewing the evidence in the light most favorable to the Government, and with due regard to the district court's opportunity to judge the credibility

of the witnesses, the district court's finding that Briseño voluntarily, knowingly, and intelligently waived his *Miranda* rights is plausible in light of the record as a whole and is therefore not clearly erroneous. Even though the interviewing agent recited only part of the *Miranda* warning in broken Spanish, Briseño then appeared to read a card with the full *Miranda* warning in Spanish, which collectively was sufficient to apprise him of "both the nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran*, 475 U.S. at 421; *see, e.g., United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) ("Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated."); *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984) ("Even if [the police officer] spoke very poor Spanish and appellant spoke very poor English, the written Spanish would have conveyed to appellant a sufficient understanding of his rights."). Briseño also referred to text messages during the interrogation, which is evidence of his ability to read. Further, nothing in the video, particularly Briseño's body language, tone, and demeanor throughout the interview, contradicts the district court's findings.[13] Because there is a reasonable view of the evidence that supports the finding that Briseño's waiver of his *Miranda* rights was knowing and voluntary, the district court did not err by denying the motion to suppress custodial statements.

IV

Briseño next argues that the Government violated the Fourth Amendment by obtaining real-time cell-site location information (CSLI) to

---

[13] Briseño did not assert any objections regarding the video or transcript at the district court, and he does not challenge or dispute the accuracy of the transcript or its English translation on appeal.

track the target phone in his possession based on the warrantless exigent requests to T-Mobile on December 19 and 21, 2022. He contends that the district court erred by failing to suppress the evidence discovered at the Miller House because the warrant to search the house relied on information derived from the illegally obtained CSLI.

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It protects against government intrusion into areas where people have reasonable expectations of privacy." *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019). "[O]fficial intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *United States v. Johnlouis*, 44 F.4th 331, 334 (5th Cir. 2022) (internal quotation marks and citation omitted).

In *Carpenter v. United States*, the Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." 585 U.S. 296, 310 (2018). It explained that CSLI reveals a cell phone's historical location; a "cell phone faithfully follows its owner," and "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts." *Id.* at 311. The Court relied on the "retrospective quality" of the data in the case before it, noting that law enforcement could now "travel back in time to retrace a person's whereabouts" and "need not even know in advance whether they want to follow a particular individual, or when." *Id.* at 312. It emphasized that its opinion only considered *historical* cell-site records, its decision was narrow, and *it was not expressing views on "real-time CSLI,"*[14]

_____

[14] "Courts distinguish between historical CSLI and real-time CSLI: historical CSLI allows law enforcement to retrace a defendant's physical movements, while real-time CSLI

other surveillance techniques, or business records. *Id.* at 316 (emphasis added).[15] As the Seventh Circuit has explained, "[r]eal-time CSLI collected over the course of several hours simply does not involve the same level of intrusion as the collection of historical CSLI." *United States v. Hammond*, 996 F.3d 374, 390 (7th Cir. 2021). This is because historical CSLI "provides an intimate window into a person's life." *Id.* at 388 (internal quotations omitted). Not necessarily so with real-time collections.

In our circuit, the question of whether obtaining and using real-time cell-site location information to track a suspect constitutes a search within the meaning of the Fourth Amendment remains an open question.[16] Because we resolve the appeal on other grounds, we need not address this issue.

As the Supreme Court clarified in *Carpenter*, "case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances." 585 U.S. at 319. A warrant is not required when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452,

---

shows (roughly) where a defendant's cell phone is currently located." *United States v. Lewis*, 38 F.4th 527, 536 (7th Cir. 2022).

[15] Notably, the CSLI in *Carpenter* was acquired under the Stored Communications Act, 18 U.S.C. § 2703(d), 585 U.S. at 317, which permits a district court to issue an order for CSLI disclosure if it finds "reasonable grounds to believe" that communications are "relevant and material to an ongoing criminal investigation," § 2703(d). The Supreme Court found that the court order was not sufficient to dispense with the warrant requirement because the § 2703(d) standard is lower than the probable cause standard. *Carpenter*, 585 U.S. at 317.

[16] It also remains unsettled in other circuits. *See Lewis*, 38 F.4th at 539 ("We leave for another day whether the collection of real-time CSLI after *Carpenter* ever amounts to a search."); *United States v. Green*, 981 F.3d 945, 958 (11th Cir. 2020) ("The question of whether acquiring [real-time CSLI] constitutes a search was unanswered in 2013 and remains unanswered today.").

460 (2011) (internal quotation marks and citation omitted). Exigencies include the need to "protect individuals who are threatened with imminent harm," *Carpenter*, 585 U.S. at 320, and "the need to assist persons who are seriously injured or threatened with such injury," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Courts "have approved warrantless searches related to bomb threats, active shootings, and *child abductions*." *Carpenter*, 585 U.S. at 320 (emphasis added).

The applicability of the exigent circumstances exception is evaluated on a case-by-case basis. *See Riley v. California*, 573 U.S. 373, 401-02 (2014). "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc). This court considers, among other things, the degree of urgency and the length of time obtaining a warrant would require. *United States v. Daniels*, 930 F.3d 393, 401 (5th Cir. 2019) (citation omitted). An action is reasonable under the Fourth Amendment, regardless of the individual officer's subjective state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *United States v. Toussaint*, 838 F.3d 503, 508 (5th Cir. 2016). When reasonable minds may disagree, this court will not second guess the judgment of "experienced law enforcement officers concerning the risks of a particular situation." *United States v. Menchaca-Castruita*, 587 F.3d 283, 290 (5th Cir. 2009) (internal quotation marks and citation omitted).

Generally, a district court's exigent circumstances determination is a factual finding reviewed for clear error; if that factual finding is influenced by an incorrect view of the law or an incorrect application of the correct legal test, this court reviews de novo. *Toussaint*, 838 F.3d at 507. The Government has the burden of proving the existence of an exigency. *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995).

Here, the Government presented undisputed evidence showing that W.Y. called the FBI late Friday afternoon on December 16, 2022, and reported that a cartel had kidnapped his wife and two-year-old child and threatened to kill them if he did not pay a ransom. The case referral was sent to the physical computers in the Baltimore office that Friday evening at 7:37 p.m. EST, but no agent was in the office to receive the referral. According to the assigned agent's declaration, which the district court credited in its decision, she immediately began working on the case after she received and reviewed the allegations the following Monday morning, December 19. The agent believed that the victims were in imminent danger and that immediate action needed to be taken because one was a child, the demanded ransom had been unpaid for several days, and the victims were being held by an unidentified cartel. By 11:00 a.m. EST that same day, the agent had met with other agents and arranged a call to W.Y. to obtain additional information about the kidnapping over the phone. W.Y. told her he had spoken to his wife on December 17, who told him that she and their child were not being fed and were sick with colds. The agent "sought corroborating information related to the facts that W.Y. was relaying" and scheduled a meeting with him for about three hours later, at 2:00 p.m.

At some point, W.Y. texted the agent about transportation difficulties, and the meeting was postponed until the next morning at 9:00 a.m. EST. "[I]n the meantime," the assigned agent "consulted with other agents," including "those who specialized in GPS pings." "[T]hat [same] afternoon," another agent submitted an exigent request to T-Mobile. And agents "*also* performed additional research regarding W.Y., [his wife] and the allegations, including social media research, database checks, and consultations with other offices." The agent's first report of December 19 lists the internal database queries made on Briseño and the target number. The search warrant affidavit avers that an FBI database revealed that Briseño

was associated with the target number, and it had been used in a prior kidnapping case. The FBI made an additional exigent request to T-Mobile on the morning of December 21.

Based on the FBI's exigent requests, Briseño's real-time cell-site location information was voluntarily disclosed by T-Mobile under 18 U.S.C. § 2702(c)(4), which allows cell phone service providers to disclose electronically stored communications "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." The FBI used the real-time CSLI to locate Briseño in Missouri, resulting in his arrest and the recovery of 20 individuals, including W.Y.'s wife and child.

The district court concluded that the request for cell-site location information and subsequent tracking of the target phone was objectively reasonable due to exigent circumstances. Specifically, it found that the agents had reason to believe that a young woman and her child "were being held against their will, and these victims were the subject of death threats if a ransom was not paid." It also found that the agents' initial failure to immediately investigate was the result of an oversight and that, upon notice, they acted with urgency. Based on the record, we find no basis to overturn the district court's findings as clearly erroneous. *See Hearn*, 563 F.3d at 101.

The entirety of the record must be viewed in the light most favorable to the Government. Baltimore agents received credible information that a young mother and her two-year child had been kidnapped by a cartel, there was a threat to kill them if a ransom was not paid, and the ransom had not been addressed for several days. Although the exact sequence of the investigation is not clear from the assigned agent's hastily-submitted

declaration,[17] the record contains evidence of a fast-moving and multi-faceted investigation.  The same day they learned of the kidnapping, agents interviewed W.Y. by telephone, sought corroborating information, coordinated with other field offices, and engaged in multiple avenues of investigation designed to quickly rescue the victims. The agents articulated an objectively reasonable basis for believing that a toddler and her mother were in immediate danger, and that pinging the kidnapper's phone could help lead them to the victims expeditiously. We conclude that the FBI's collection of Briseño's real-time cell-site location information was objectively reasonable under the circumstances.

As recognized in *Carpenter*, urgent situations, like child abductions, "will likely justify the warrantless collection of CSLI." 585 U.S. at 320. Other circuits have held that the exigent circumstances exception applies to the tracking of a suspect's cell phone location in cases involving children. *See, e.g., United States v. McHenry*, 849 F.3d 699, 706 (8th Cir. 2017) (holding that exigent circumstances justified the warrantless request for real-time location data to locate a juvenile victim of sex trafficking); *United States v. Gilliam*, 842 F.3d 801, 805 (2d Cir. 2016) (holding that exigent circumstances justified obtaining GPS location information where defendant was suspected of prostituting a missing child across state lines). Notably, since *Carpenter*, at least two other circuits have held that obtaining real-time cell-site location information under § 2702(c)(4) to locate a suspect was appropriate based on exigent circumstances. *See United States v. Karmo*, 109 F.4th 991, 995-96 (7th Cir. 2024) (holding that exigent circumstances, based on tipster's credible information that defendant was traveling with firearms intending to loot and

---

[17] Briseño raised the CSLI issue for the first time in his reply to the motion to suppress. As noted, the Government was given less than a day to obtain and file the Baltimore agent's declaration in response.

"pick people off", justified law enforcement's tracking of defendant's real-time CSLI by way of a § 2702(c)(4) request to defendant's cell phone provider); *United States v. Hobbs*, 24 F.4th 965, 970-72 (4th Cir. 2022) (holding that law enforcement's use of the exigent form to defendant's cell phone provider to obtain his cell phone location data was justified under the exigent circumstances exception, where defendant had a violent criminal history, was armed and had threatened to kill his former girlfriend, her child, and any law enforcement officers who tried to apprehend him).

Considering the entire record as a whole and construing the evidence in the light most favorable to the Government, we conclude that the district court did not err in concluding that the warrantless collection of Briseño's real-time CSLI was justified by exigent circumstances. Having found no constitutional violation in the FBI's collection of CSLI that formed part of the basis for the agency's warrant to search the Miller House, we need not consider Briseño's argument that evidence obtained during the residential search should be excluded as fruit of the poisonous tree.[18]

---

[18] In conjunction with this argument, Briseño's initial brief mentions that "[w]hile the affiant stated on the affidavit that a warrant was issued for the CSLI, the affiant should have thus known that was not the case." "A party forfeits an argument by failing . . . to adequately brief the argument on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). "To be adequate, a brief must address the district court's analysis and explain how it erred." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023) (citation omitted). Briseño has forfeited any argument that the warrant affidavit was invalid because it incorrectly stated that a warrant had been issued for the CSLI. Even if the argument was not forfeited, there is no indication that the misstatement was done "knowingly and intentionally, or with reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 155 (1978). Briseño did not present any proof that the Task Force officer submitted the affidavit knowing of the false statement about the warrant or with reckless disregard for its truth. *See United States v. Cavazos*, 288 F.3d 706, 709–10 (5th Cir. 2002) (noting that defendant has initial burden of proving that false information for search warrant "was given intentionally or recklessly"). Briseño has not shown the district court erred in finding that

No. 23-10797

We AFFIRM the district court's denial of Briseño's motion to suppress evidence.

_____

"the inclusion of the term 'warrant' in the warrant affidavit was simply a mistake of immaterial nature as opposed to perjury or reckless disregard for the truth."

No. 23-10797

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting:

The majority concludes that Rodrigo Napoles Briseño was sufficiently warned as required under *Miranda v. Arizona*, 384 U.S. 436 (1966). The majority also concludes that an uncorroborated accusation made in a telephone call from an unknown person to the FBI is sufficient to allow the warrantless tracking of another person's cell phone. I disagree. The record here shows that Briseño was not properly *Mirandized*. The record also shows that the government failed to establish that there were exigent circumstances to justify the warrantless tracking of his cell phone. Because the district court erred in denying the motion to suppress, I would vacate and remand. Thus, I respectfully dissent.

On December 16, 2022, an unknown individual, W.Y., called the FBI and reported that he had paid for his wife and child to be illegally transported into the United States through Mexico, but they had been kidnapped by a cartel and were being held for ransom in Dallas. W.Y. also told agents that he and his wife remained in regular contact, and he was receiving phone calls from her at least every other day from a number ending in "2612" as well as calls or messages from a WhatsApp number. The information was routed to FBI agents in Fort Worth, who referred it that same day to FBI agents in Baltimore, where W.Y. lived.

The Baltimore agents did not pick up the message until December 19, when they began an investigation. That same day, the Baltimore agents contacted W.Y. for an in-person interview with a Spanish interpreter present, but he said that he had no vehicle nor any money for transportation and could not meet with them that day. The agents made no attempt to drive to W.Y.'s location to meet with him and made no offer to provide a means of transportation for W.Y. to get to them, both clear indications that agents did not believe there were exigent circumstances. Instead, the agents simply

28

rescheduled an in-person interview for the following day, December 20. Despite language barriers, agents said that W.Y. also told agents that his wife and daughter had colds, claimed they were not being provided with food, and said that he had last spoken with his wife the day before. The alleged ransom demand was linked to the telephone number ending in "2612."[1]

Rather than wait to interview W.Y. the following day, or do any investigation to corroborate his claims, or obtain a warrant, the FBI instead requested exigent cell site location information (CSLI) for the "2612" number from the carrier, T-Mobile, to ping the location of the cell phone on December 19, 2022.[2] Importantly, the request sought subscriber information, call detail records with cell sites for the previous 48 hours, continuous ping location of the cell phone every ten minutes for the next 48 hours, and "timing advance with cellsite" for the previous 48 hours.

_____

[1] W.Y. made inconsistent statements regarding the amount of the alleged ransom. One day he said the ransom was $34,000 and another day he said it was $40,000. The criminal complaint and warrant affidavit both claimed it was $23,000.

[2] The majority states that "the exact sequence of the investigation is not clear from the assigned agent's hastily-submitted declaration," and the following: "Briseño raised the CSLI issue for the first time in his reply to the motion to suppress. ROA.327-29, As noted, the Government was given less than a day to obtain and file the Baltimore agent's declaration in response. ROA.347-60, 363-65." (Maj. Op. at lines 624-26 and n. 17). However, the agent's declaration clearly states the events in chronological order and lists the exigent CSLI request as occurring prior to the assertion that "agents also performed additional research." ROA.365. Additionally, Briseño raised the CSLI issue in his Defendant's Reply to Government's Response to Defendant's Motion to Suppress after the government asserted that, "[t]he phone's carrier provided phone records to the FBI" and "[t]he target phone was associated with a previous kidnapping case," among other things. Moreover, there is nothing in the record to indicate that the government was somehow at a disadvantage or did not have adequate time to prepare the assigned agent's declaration, which states that it was executed a month before the suppression hearing. ROA.365. Also, the district court in fact ruled for the government.

No. 23-10797

On December 20, 2022, agents discovered that the cell phone was pinging in an area west of Fort Worth.  On December 21, the FBI renewed the warrantless request "while the agents in Baltimore were attempting to obtain a search warrant to locate the device."  A short while later, agents were able to use the pings to track the location of the phone to a Black Ford Expedition traveling in Missouri.

When local authorities stopped the vehicle, Briseño was identified as the driver and the owner of the telephone.  He was arrested, taken to the local detention center in Missouri, and subsequently interviewed by two FBI agents for nearly five hours.  Several minutes into the interview, Briseño was read some of his Miranda rights in broken Spanish and briefly handed a small card with the warnings in Spanish, as discussed in more detail below.  During the subsequent interrogation, Briseño told the agents that the woman and child were not kidnapped, but that the husband was lying because he had not yet sent the money to get them to Baltimore.  He also provided evidence on his cell phone to support his claims.  That evidence included photos, videos and communications between the woman and her husband, W.Y., and her aunt in Honduras.  He also showed agents photos from when he took them out to dinner.  Further, Briseño played a voice message from his cousin, who was running the operation.  The agent confirmed that there was no panic or anger in the cousin's voice and he sounded happy.  Briseño was also receiving texts from W.Y. during the interrogation and showed those messages to the agents.

Additionally, Briseño provided the agents with the address for his cousin's house on Miller Avenue in Fort Worth where the woman and child were staying, detailed information about who was in the house, security information, and various other details.  The agents were communicating information to agents in Texas during the interrogation.  Agents in Texas then sought a search warrant for the house on Miller Avenue based on that

No. 23-10797

information. Significantly, the affidavit in support of the warrant falsely represented that agents had obtained a search warrant to ping Briseño's phone.

Briseño was later indicted. Prior to trial, he filed a motion to suppress incriminating statements he made during the custodial interrogation because he had not been properly Mirandized, and because the FBI obtained CSLI without a warrant when there were no exigent circumstances. His motion was denied.

Briseño eventually entered a conditional guilty plea to one count of conspiracy to transport and harbor illegal aliens for the purpose of commercial advantage and private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii) and (iii). The plea was conditional in that Briseño reserved the right to appeal the district court's denial of his motion to suppress.

The district court adopted the probation officer's conclusions as to the appropriate guideline range, which was between 51 and 63 months based on a total offense level of 24 and criminal history category of I. The statutory cap was 120 months. The government filed a motion pursuant to U.S.S.G. § 5K1.1 asking the district court to "consider the substantial assistance" provided by Briseño, recounting his cooperation, and his assistance in providing information that led to the rescue of 20 victims and the arrest of two coconspirators. The motion further asked the court to depart from the guidelines based on Briseño's "substantial assistance" and the following factors:

> (a) [T]he significance and usefulness of the defendant's assistance; (b) the truthfulness, completeness, and reliability of the information provided by the defendant; (c) the nature and extent of the defendant's cooperation; (d) the danger, and risk

of injury to the defendant and his family as a result of his election to cooperate; and (e) the timeliness of his assistance.

The government also asserted that Briseño should be sentenced to less than the statutory cap. The district court granted the motion, said that it did not believe the guidelines were adequate in this case, said that an upward variance of the guidelines range was appropriate, and sentenced Briseño to 84 months.

## I. *Miranda* warnings

Briseño asserts that the district court erred by not suppressing his custodial statements because the agents failed to properly issue his *Miranda* warnings and he did not knowingly waive his rights under the Fifth Amendment.

As stated by the majority, *Miranda* warnings must be administered prior to a custodial interrogation to protect a defendant's Fifth Amendment right against self-incrimination. *See United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006). There is no dispute that this was a custodial interrogation.

In *Miranda*, the Supreme Court said the following:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Id.*, 384 U.S. at 444. The Court also said that a defendant "must first be informed in clear and unequivocal terms that he has the right to remain silent." *Id.* at 467-68. "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." *Id.* at 469. A defendant also "must be clearly

informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today." *Id.* at 471. "No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." *Id.* at 471-72. Further, the warning must specify that counsel will be appointed if the defendant is indigent. *Id.* at 473.

The majority sets out the district court's findings, some of the facts, and some of the applicable law. For example, the majority quotes *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005), for the following: "There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*." However, it is necessary to look at that declaration in context, along with other cases, to correctly analyze this issue. In *Cardenas*, this court said:

> To counter the inherently coercive nature of custodial interrogation, under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*. *See California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Nevertheless, the Miranda safeguards are "most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one." *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir.1994).

*Id.* at 292. This court also reiterated the following:

> The inquiry whether a valid waiver has occurred has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 293 (internal marks and citations omitted).

The majority and the government both concede that Briseño was only read some of his rights. Despite that concession, the majority concludes that: "Briseño then appeared to read a card with the full *Miranda* warning in Spanish, which collectively was sufficient to apprise him of 'both the nature of the right being abandoned and the consequences of the decision to abandon it.'" The majority quotes *Moran v. Burbine*, 475 U.S. 412, 421 (1986). However, the record does not support the majority's conclusion that Briseño read the card, and *Burbine* did not hold that appearing to look at a card for a few seconds was sufficient to apprise a defendant of both the right being abandoned and the consequences of that decision. In that case, Brian Burbine was fully advised of his rights multiple times and also signed an express written waiver three separate times. *Burbine*, 475 at 417. Additionally, he was left alone in a room with a telephone at least twice but declined to use it to call his lawyer. *Id*. at 418. *Burbine* is easily distinguishable as Briseño was never fully advised of his rights, never signed a written waiver, and was not even asked whether he understood.

The majority quotes *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990), for the following: "Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his Miranda rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." Notwithstanding the fact that *Hernandez* is not controlling authority, Briseño was not fully and

clearly advised of his rights in his native tongue, and he never claimed to understand such rights.  The majority also quotes *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984), for the following: "Even if [the police officer] spoke very poor Spanish and appellant spoke very poor English, the written Spanish would have conveyed to appellant a sufficient understanding of his rights."  Again, this is not controlling authority, and is easily distinguishable.  In that case, the record established that the "appellant was orally read his rights in both Spanish and English, that he appeared to understand them, that he read and signed cards explaining his rights in both languages, and that he continued to converse with [the officer] in both languages thereafter."  Here, Briseño was not orally advised fully of his rights in Spanish or English, and there was no inquiry into or acknowledgment that he either read or understood them orally or in writing.

The majority refers to the interviewing agent's "training and experience" that Briseño fully understood his rights because "Briseño did not say that he was unable to read [the card] or that he did not want to speak."  However, there is no authority for such a proposition, which would require Briseño to have read and understood the card to be able to express that, in accordance with his rights, he did not want to speak.  Also, without an inquiry into whether he read and understood his rights, Briseño would not have known that he needed to explain to agents that he could not read the card or did not fully understand.  Additionally, the agent testified that his "training and experience" was to have the defendant read and sign a *Miranda* waiver form.  The agent said he failed to do so here because he did not have advance notice to bring any written forms.  But that does not explain why the agent failed to write out a waiver, have Briseño sign the card that he did have, fully advise him of his rights, or even ask him whether he understood his rights.

As quoted by the majority, when the agent was attempting to explain what authorities were investigating, he asked Briseño if he understood. Briseño responded: "Oh, no, n—." The statement to which Briseño replied "Uh-huh" was when the agent said: "Yes. And, uh, we at this moment, uh, we do not stay [sic] uhm, carry [sic] you. We only want to find [banging noise] this, this girl, and her mother. Her mother is, is the 19-year-old young woman." Other times, Briseño responded "Um-hmm"; "mm-hmm"; "Hmm"; or "mm—". With regard to the card, the agent said:

> Uhm, but, and you can read this if it is, it is better—because, like you know, I cannot speak, uh, Spanish very well. But at this moment, the thing that is more important for us and for you is to locate these, these two people. Nothing else. [pause] Jonathan and I, uhm—

To which Briseño replied: "Um-hmm." The agent then continued, "—[tapping noises] have worked together on cases like this very frequently—."

The majority relies on the district court's findings that the agent's testimony "about the circumstances surrounding the interrogation" were "credible, persuasive, and uncontroverted." However, the record does not support such a finding. What is uncontroverted is that the agent failed to advise Briseño fully of his rights. What is also uncontroverted is that the video of the interrogation fails to establish that Briseño read or understood the card in the mere seconds he had it in his hands. The agent's opinion on whether he thought Briseño read the card in no way changes those uncontroverted facts. Moreover, the card, as quoted by the majority, explicitly asked Briseño questions to which he did not respond—further indication that he did not read or understand it.

The majority also points to the district court's finding that Briseño's references to text messages during the subsequent interrogation "suggested that he was literate," and "that the video of Briseño looking at the card for at

least twenty seconds and the uncontradicted agent testimony that Briseño appeared to be reading it suggested that Briseño had read the card." There is no authority for the proposition that a later suggestion of literacy somehow establishes that Briseño was fully and clearly warned, and that he knowingly, intelligently, and voluntarily waived his rights. Further, there is no authority to support the majority's conclusion that the agent's testimony that Briseño "appeared" to look at the card somehow establishes that he read it, understood it, reconciled it with the broken Spanish ramblings the agent had offered just moments prior, and knowingly waived his rights in the few seconds the agent stopped talking.[3] There is no authority for the majority's proposition that the agent could somehow determine that Briseño understood his rights based on *these* facts and the agent's "training and experience."

The record clearly establishes that the agent did not fully and clearly advise Briseño of his rights as required by *Miranda* prior to any questioning. *See Florida v. Powell*, 559 U.S. 50, 53 (2010); *see also Miranda*, 384 U.S. at 444, 467-73; *California v. Prysock*, 453 U.S. 355, 359-361 (1981). The fact that Briseño appeared to look at a card for a few seconds, by itself – since the agent never inquired as to whether Briseño understood his rights, does not cure this failure. This is exactly the "circumstantial evidence" to which the *Miranda* Court referred. *Id.*, 384 U.S. at 471-72. Moreover, Briseño could not knowingly, intelligently, or voluntarily waive his rights unless and until adequate warnings were given. *See id.*; *see also Cardenas*, 410 F.3d at 292.

---

[3] The majority's references to 20, 25 and 31 seconds are misleading because, as the majority concedes, the agent was still talking to Briseño for the majority of that time and the video shows that Briseño did not have the card in his hand for 31 seconds. Further, there were also banging and tapping noises and other agents talking in the background at various times.

No. 23-10797

Thus, the district court erred in denying the motion to suppress Briseño's custodial statements. *See Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

## II. CSLI and search warrant

Briseño asserts, in relevant part, that his incriminating statements made during the custodial interrogation and the evidence discovered pursuant to the warrant should be suppressed because the government violated the Fourth Amendment by obtaining cellphone pinging information without a warrant in order to locate and arrest him before he made his statements. Briseño also asserts that the good-faith exception should not apply to evidence obtained in violation of the Fourth Amendment, and that the affidavit in support of the search warrant falsely stated that a warrant had been obtained to track his phone.

The majority concludes that a mere telephone call from an unknown person to the FBI is sufficient to allow the warrantless tracking of another individual's cellular telephone. The majority then cites dicta from another circuit in an attempt to distinguish Supreme Court precedent and establish that real-time tracking of a cell phone does not involve the same level of intrusion as the collection of historical data for purposes of a search under the Fourth Amendment. The majority does so while simultaneously acknowledging that it remains an open question, and saying that, "[b]ecause we resolve the appeal on other grounds, we need not address this issue." More significantly, the majority also does so despite the fact that the request here sought both historical and real-time data. Finally, the majority concludes that the warrantless tracking of the cell phone was justified by exigent circumstances. I disagree.

The majority states that agents had reason to believe W.Y.'s wife and child had been kidnapped by a cartel, who threatened to kill them if a ransom was not paid. The only evidence that agents had at the time they sought CSLI

request was W.Y.'s phone call.  The majority's references to statements in various reports in no way changes that fact, as the majority concedes that there is no evidence establishing that any additional research was done prior to the exigent CSLI request.  Additionally, as the majority also concedes, "[t]here is no explanation in the record of what these [Guardian, Sentinel and DIVS] queries are or what they entail."

Despite those facts, the majority simply cites the government's conclusory assertions.[4]  The majority first relies on a conclusory statement in the affidavit for a search warrant executed on December 21, 2022, that said: "Records from an FBI Database identified that the target phone was used in a previous kidnapping case.  The person associated with the phone was identified as Rodrigo Briseno white male date of birth [redacted] 1992, based on wire transfers associated with the previous kidnapping case."[5]  But much like the record, the affidavit fails to provide any evidence in support of that statement, such as which database, what previous kidnapping case, what wire transfers, etc.  Even if the affidavit did provide such evidence, it fails to establish that the government knew any of it prior to the exigent CSLI request.  The majority then points to the criminal complaint filed on December 27, 2022, which stated that "[r]ecords from an FBI database identified that the target phone was associated with a previous kidnapping case."[6]  The inclusion of that conclusory statement in a complaint filed after

---

[4] The majority repeatedly asserts that, in reviewing the district court's denial of a motion to suppress, we review the evidence in the light most favorable to the prevailing party.  But here, the government provided no evidence connecting Briseño or his phone to some other alleged kidnapping.  The majority also asserts that, "[t]he entirety of the record must be viewed in the light most favorable to the [g]overnment."  But we are not free to conclude that agents took various actions earlier than established by the record.

[5] This is the same affidavit that falsely stated the CSLI was obtained with a warrant.

[6] Interestingly, both the affidavit and the complaint also stated that the alleged ransom demand was $23,000, as discussed previously herein.  Yet the majority fails to rely

the fact in no way establishes that Briseño was involved in a previous kidnapping or that FBI agents knew that information prior to the exigent CSLI request.[7]

Based on the record before us, it is clear that the FBI had not corroborated W.Y.'s claims at the time of the exigent CSLI request to T-Mobile.  It is also clear that the FBI did not know about some other alleged kidnapping associated with the phone at the time it made the request.  Further, a careful reading of the record indicates that Summer Baugh, the FBI agent investigating in Baltimore, planned to corroborate W.Y.'s claims when he visited the Baltimore Field Office that afternoon.  Also, Baugh said that "in the meantime," between when she spoke to W.Y. on the phone and his scheduled meeting, she "consulted with other agents in [her] office and those who specialized in GPS pings."  The agent also said that "based upon these conversations," FBI Special Agent Mat Wolfe submitted an exigent request form to T-Mobile.  After that, the agent said that other agents did additional research regarding W.Y., his wife and the allegations.  Baugh's declaration says nothing about Briseño's phone being connected to some other alleged kidnapping case or that being a reason for the exigent CSLI request.  The exigent request form also says nothing about Briseño's phone being connected to some other alleged kidnapping case.

Moreover, the database checks or queries in the record cited by the majority do not explicitly say anything about Briseño's phone being connected to some other alleged kidnapping case.  They merely say the

_____

on that portion of these documents.  The majority also fails to address the discrepancies in the varying amounts of the alleged ransom demand.

[7] The majority also discusses the subsequent interview with W.Y.  While the majority fails to cite any specific corroborating evidence provided by W.Y., his interview is irrelevant to the CSLI which was requested the previous day.

number of results that were associated with various queries. For example: "A Guardian query for '[redacted] 2612' revealed zero results."; "A Sentinel query for '[redacted] 2612' revealed three results, including 7A-DL-3659257 serial 12, 21 and 25. In XX-DL-3659257, number is associated to Rodrigo Napoles Briseno, date of birth [redacted] 1992, address [redacted] Fort Worth."; and "A Guardian query for 'Rodrigo Napoles Briseno' revealed zero results."

The majority summarizes the district court's findings that the agents "had reason to believe" W.Y.'s wife and child were being held for ransom, and says the record supports the finding of exigent circumstances. Yet the majority points to absolutely nothing in the record that corroborated W.Y.'s claims prior to the CSLI request. There are no exhibits of threatening texts or voice messages or anything else. It had already been days since the alleged ransom demand. W.Y. was still in regular contact with his wife and child. We have only agents' beliefs based on an unknown caller's claims. The agents had neither met with the caller nor examined his phone at the time of the exigent CSLI request. The situation was not exigent enough for agents to drive to W.Y.'s location in Baltimore or to arrange transportation for him to get to them. The agents did nothing to secure W.Y.'s phone in case "a cartel" contacted him with another ransom demand. The record indicates that agents simply took W.Y.'s word for it and submitted an exigent CSLI request.

Further, the agents knew what Briseño had told them and shown them on his phone before they ever obtained a warrant to search the house in Fort Worth. The agent confirmed that the people involved seemed happy. The agents certainly did not seem to have a sense of "urgency" or act as if "mother and child were in imminent danger," as portrayed by the majority. Instead, the interrogation included lots of chuckling, bantering about things like cows, horses, and how to pronounce curse words in Spanish, and meal

breaks.  While agents were interviewing Briseño, one of them was relaying what he was saying to other agents in Texas.  Also, the agents told Briseño at one point that they were trying to get a warrant.  The agent also got Briseño to confirm various other details about his cousin's house and who would be there.  But nothing conveyed a sense of imminent danger.

However, it is clear that Briseño's statements made during the custodial interrogation without having been properly *Mirandized* were crucial in getting the search warrant.  It is also clear that those statements were only obtained because agents used a warrantless CSLI request to ping Briseño's phone without corroborating any basis for exigent circumstances.  Accordingly, the district court erred in denying the motion to suppress, and the evidence obtained pursuant to the search warrant should be excluded as fruit of the poisonous tree.  *See Carpenter v. United States*, 585 U.S. 296, 310 (2018); *see also Utah v. Strieff*, 579 U.S. 232, 237 (2016); *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018).

For these reasons, I would vacate and remand.  Thus, I respectfully dissent.